## NATIONAL LABOR RELATIONS BOARD v. SCHAEFER-HITCHCOCK CO.

### No. 10118.

Circuit Court of Appeals, Ninth Circuit.
Nov. 12, 1942.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, Morris P. Glushien, David Findling, and William T. Whitsett, Attys., National Labor Relations Board, all of Washington, D. C., and W. A. Babcock, Jr., of Seattle, Wash., for petitioner.

C. H. Potts, of Coeur D'Alene, Idaho, for respondent.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

This case is before the court upon petition of the National Labor Relations Board for enforcement of its order issued against Respondent for alleged violations of the National Labor Relations Act.

The Schaefer-Hitchcock Company, herein referred to as Respondent, is principally engaged in the manufacture and processing of wooden poles. One of its plants is located at Priest River, Idaho, and it is conceded that much of the material used at the plant and nearly all of the product thereof move in interstate commerce.

The Board found that Respondent had violated Section 8(1) and (3) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., by sponsoring and participating in a meeting of its employees through certain of its supervisory employees and by discharging Clifford Damschen because of his union activities.

The Board ordered Respondent to cease and desist from the unfair labor practices found, to reinstate Damschen with back pay, and to post appropriate notices.

The Respondent contends that the findings as to unfair labor practices are not supported by substantial evidence.

The testimony shows that Damschen had been employed by Respondent since the spring of 1935. The foreman, who discharged him, testified that his work had been "quite satisfactory" to his employer. Beginning in February, 1941, Damschen began mentioning the subject of joining a union to several other employees of the company. Thereafter he requested a friend to invite a union organizer of his acquaintance to visit the plant. The organizer came on February 10, 1941, and Damschen signed up to join the union. He tried to get in touch with as many members of the plant's crew as possible that day, but it was late and most of them had gone home. After talking the matter over with three or four of the workers it was decided there were not enough to warrant holding a meeting that night, and they agreed to notify the employees the next day and hold a meeting on the evening of February 11, 1941.

It had become generally known about the plant that an organizer was in the district. After supervisor Wear and inspector Cronkright heard that the union organizer was in town, they immediately began talking to the men about having a meeting of the employees to discuss the subject, with the obvious purpose of forestalling the effort being made by Damschen to have the employees join a union.

As indicative of the spirit and intention which actuated these plant bosses in promoting their drive against any union labor organization, one of the workers recounted a conversation he had with Mr. Wear during the day on the evening of which the organizer was scheduled to hold his meeting. Said this witness: "He [Wear] asked me when he came up if I knew that CIO organizer that came to the boiler room that day, and I told him that I did not. 'Well,' he said, 'he was from Sandpoint.' 'Yes,' I said, 'I heard him make that statement, but I don't know him.' And he asked then what I thought about the union, and I told him I figured that it had come to a point where a union was necessary. And he asked me why I thought that, and I said I understood the way a lot of these matters were handled, that with material shipped by non-union labor, union labor could very well refuse to accept it or handle it, and it would be very possible that in Mr. Schaefer's business some poles would be shipped some place sometime and that condition would come up. And he told me then that until that condition did come up it was better to let that alone, and if it did come up, then Mr. Schaefer could advise us to join a union, and what union."

That night only Damschen and two other employees assembled for the meeting which was to be addressed by the organizer, and it was there decided to postpone the meeting until February 19, 1941, in order to secure a better attendance. Wear and Cronkright thereupon decided to hold their own meeting for the plant employees on February

15th, which would be a few days before the union organizer's meeting, which had been set for February 19th. Accordingly, word was passed out to the employees that there would be a friendly gathering "at the Peterson Hotel to decide whether or not they would have a union", and possibly as an inducement to stimulate attendance, it was also made known that it was intended to have a party there after the meeting had been held.

As the Respondent was charged with responsibility for the conduct of Patrick J. Conlee and Con Wear, we here take note of the relationship of these persons to the company and with the employees. Conlee was the foreman and the ranking official who during the period here under consideration was in charge of the plant. Prior to his coming to Priest River, from 1930 to 1938, he had been superintendent of the Respondent's yard located at Minneapolis and was there when employees of that plant were out on strikes in 1935 and 1936 and again in 1938. At the time in question in the instant case Wear was the company's supervisor. Prior to Conlee's transfer from Minneapolis in 1939 Wear had been in charge of the Priest River plant. After Conlee came Wear was in authority whenever Conlee was absent from the yard; he regularly transmitted Conlee's orders to the employees concerning the work they were to do; he was consulted and at times made recommendations as to the hiring and firing of the workers. Employees who were witnesses also designated him as a "straw boss".

On February 15, 1941, which was the date that Wear and Cronkright had arranged for their meeting, Wear met Damschen and invited him to attend the meeting of the employees at the hotel that afternoon. Wear said, "We are going to have a little meeting at the Peterson Hotel at 4 o'clock and I would like to have you attend. We are going to discuss this union thing and decide whether to join a union or not." Damschen asked who was going to be there to represent the union, and Wear said this wasn't going to be that kind of meeting—it was just going to be a friendly chat among the workers to see what they thought about unions. Damschen told Wear he did not believe that such a meeting would be very appropriate without someone there to present the union side because none of the boys really knew what a union was; he suggested having an organizer there to give the union viewpoint, mentioning that one would be there in a few days and there could be a two-sided meeting. Wear said, "Well, you can have your union men if you want them, but this is just going to be a friendly chat among the workers."

What happened at this company meeting of February 15, 1941, is revealed by the following narrative:

According to the testimony, approximately twenty-one of the twenty-six employees at the plant were present at this meeting. After waiting until a majority of the crew had arrived, one of the workers said, "Well, let's get this thing over with and find out what we are going to do." Damschen then asked who was going to do the talking and Con Wear stated, "Well, our foreman, Mr. Conlee, is here with us. He has had some good experience with unions back East, and I believe he can tell us a whole lot about them." Mr. Conlee was the general foreman in charge of the pole yard.

After Wear had made the statement about Conlee, Mr. Conlee started to speak and said, "Boys, as far as I can see, everything has been going rosy in the yard. I thought we were getting along swell. And I believe if any of you fellows have any troubles to be settled you could come to me, and if I can't do anything for you, I will go higher. I have had experience with unions back East; they went out on strike and lost much more than they gained by their strike. They can call you out on strike any time they want to and tax you on your dues." Damschen interrupted Conlee at this point and said he understood that men in the local had the right to vote as to whether they were taxed or went out on strike, and Conlee said, "Yes, but they tell you how to vote."

Damschen then suggested that there were several who did not understand what the union was, and that they should have an organizer or someone there to defend the union and make it a two-sided discussion. Conlee then said, "That would not be a two-sided discussion. Them fellows have answers for every question you ask. They can paint some beautiful pictures, but I never seen one developed." After this exchange of remarks, Damschen went on to say he thought there were several that really were not satisfied with wages and working conditions and also mentioned his own wages. Conlee asked him where they

paid any more for his type of work, and he told Conlee at the Newport yard or most any place that they used tractors, and mentioned the fact that a union organizer would be in the following Wednesday and they could have a two-sided meeting.

George Cronkright, who, with Con Wear, had been instrumental in promoting this meeting, also gave a short talk. He told about the yard at Bovill, Idaho, which Respondent had recently purchased; that there was a union there when the Schaefer-Hitchcock Company bought the place, but that the employees then were glad to go ahead with the new owners without a union. A few others spoke; everything that was said was unfavorable to the union.

Finally one of the workers suggested taking a vote and getting it over with, but Damschen opposed this, declaring that they could not vote intelligently unless they heard both sides of the story. He told the meeting that a union organizer would be in the following Wednesday and they could have a two-sided meeting. So the meeting broke up without a vote; Mr. Conlee left; and the gathering was turned into a party.

Following the events narrated, Damschen persisted in his union activities by continuing to contact his fellow employees and urging them to attend the union meeting on February 19, 1941. Although practically all of the workers had been invited and ten or twelve had manifested an interest, the scheduled meeting did not take place because Damschen was the only one who appeared at the hall which had been hired for the occasion, other than the organizer and some members of the local union at Newport, who had come over to Priest River with him.

Thereafter supervisor Wear and Damschen had another conversation, in the course of which Wear again brought up the subject of unions. According to Damschen's version of the discussion, Wear said, in part, that "we had been getting along pretty well, and he hated to see a union come in and break us up. Then I told him I had not been satisfied with my wages for some time, and he said, 'Well, I believe we can straighten things out without a union.'"

Although there was no further attempt to hold any organizer union meetings, Damschen "went on talking union". He was discharged on March 19, 1941.

The testimony on which the Board relies is not controverted, but Respondent contends that it does not warrant the inferences drawn therefrom, and insists that the Board was required to accept the testimony of Mr. Schaefer, the president of the company, and of Mr. Conlee, the foreman of the plant, to the effect that the meeting of the employees of the plant at which Mr. Conlee spoke disparagingly of labor unions was not instigated by the company and that Damschen had not been discharged for his union activities.

The evidence establishes that Conlee and Wear enjoyed a supervisory status in Respondent's plant. Even if the conduct and utterances of Conlee and Wear might have been beyond the scope of their authority or contrary to the desires or instructions of the company (which on all the testimony we are not required to infer), nevertheless, in view of the supervisory status of these individual representatives of Respondent, the anti-union sentiments expressed might well be regarded as representing the attitude of Respondent, and thus their conduct brought the company "within the reach of the Board's order to prevent any repetition of such activities and to remove the consequences of them upon the employees' right of self-organization, quite as much as if [it] had directed them".

Nor is there any merit in the argument that the foreman and supervisor of respondent company acted within their rights in expressing adverse opinions concerning the union and that their utterances were within the protection of the First Amendment to the Constitution of the United States. This court, in discussing a similar situation in the case of National Labor Relations Board v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, 786, said:

"This court has held that an employer may express his opinion as to the disadvantages of belonging to a union, and he might also state why he believes an employee would be better off if he did not belong to any union. National Labor Relations Board v. Union Pacific Stages, Inc., 9 Cir., 99 F.2d 153. But an employer may not, by word or conduct, coerce his employee or in any way obstruct his effort to organize his own union or interfere with his union activities in any way, and the employer is, further, forbidden to establish an employer-dominated union. The respondent here did not confine its activities to the ac-

complishment of things permitted, but definitely went beyond this and illegally interfered with its employees' activities, * * *.

"While there is no direct testimony that the manager himself made any remarks derogatory to the Union, and while he testified that he did nothing himself to interfere with the Union's activities at the mine, nevertheless those who occupied supervisory positions immediately under him were not so circumspect. * * *"

The right of free speech cannot be invoked to coerce employees. Even expressions of opinion of such a nature as to intimidate and coerce employees have been held to violate the Act. National Labor Relations Board v. Virginia Elec. & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348; International Ass'n of Machinists v. Labor Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50.

In the light of all the testimony, under controlling decisions, we must hold that supervisory status as to both Conlee and Wear is sufficiently established to effectuate employer liability for their conduct under the Act. International Ass'n of Machinists v. Labor Board, supra, 311 U.S. 72, 79, 80, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Co. v. Labor Board, 311 U.S. 514, 520, 521, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 599, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Pac. Gas & Elec. Co., 9 Cir., 118 F.2d 780, 787; Swift & Co. v. Labor Board, 10 Cir., 106 F.2d 87, 93; Consumers' Power Co. v. Labor Board, 6 Cir., 113 F.2d 38, 44.

The Board found that Respondent was responsible for the conduct of its supervisory employees; that the instigation of the counter meeting by, and the statements of, these individuals interfered with, restrained, and coerced its employees in the exercise of their rights guaranteed by the Act. We hold that the findings in this regard are supported by the evidence and sustained by the law.

As to the Discharge of Damschen.

Damschen's activities in behalf of the endeavor to organize Respondent's employees appear from the facts above narrated. He had been regularly employed at the company's plant for about six years. He had never previously been laid off except when the yard had been shut down. He it was who talked to the other employees about organizing the plant; he invited the union organizer to hold a meeting; he joined the union. At the meeting of the company employees called by Wear he alone spoke in opposition to the anti-union speeches of Conlee and Wear. He made a plea for higher wages. He was the only one that attended the union meeting held thereafter, and he continued his efforts in behalf of the union, until his discharge by Conlee with the comment, "We are cutting down the force. We won't be needing you any more." A few days thereafter Damschen and two representatives of the union went with him to the plant to seek his reinstatement. They first called on Mr. Conlee, who stated that Damschen had been dismissed because they were cutting down the force. When asked when Conlee would put him back, he answered, "We are not going to put him back on the job." When asked why, his reply was, "That is none of your damn business." President Schaefer was next interviewed. The reason he gave for Damschen's discharge was different from the one assigned by Conlee. Mr. Schaefer said, "He [Damschen] was rough on the machinery. I caught him jerking the tractor, and I told Pat [Conlee] to can him." Then particularly addressing Damschen, he said, "I understand you told some one you had not been satisfied with your wages for three years. * * * By God, if a man ain't satisfied there, he can quit." When Damschen said he would like to go back to work, he was told to see Conlee.

This explanation of Schaefer did not agree with the testimony of Conlee to the effect that Damschen's work had been "quite satisfactory", that he had "nothing particular" against Damschen, and that he had discharged him without consultation with Schaefer or anyone. The fact that Damschen had never been criticized for his work was not disputed. The dismissal was contrary to the usual practice of Respondent in retaining those employees who had worked for it for more than two years. Damschen was the only one released although he had greater seniority than most of the employees, some of whom had only recently been hired.

Notwithstanding Conlee's admission that Damschen's work had been "quite satisfactory", he was never recalled when men were needed to do the same work he had also performed on occasion. Instead many new employees were hired. When questioned why Damschen had not been as-

signed to a tractor which was put in use and to which no one had been regularly assigned, Conlee replied, "Well, I guess I just did not want Damschen, I guess was the reason." Near the close of his cross-examination Mr. Conlee was again pressed to explain why Damschen had not been offered re-employment. The following excerpt is from his testimony:

"Q. Well, you knew that he had requested re-employment on the 22nd day of March, did you not? A. Yes.

"Q. Then why didn't you notify him? You knew where Damschen lived? A. Yes, sir.

"Q. You knew Damschen had worked for the company for a number of years? A. Yes, sir.

"Q. Did you have any other explanation for not offering him re-employment? A. None further than the statement I made a little while ago that I just did not want him any more.

"Q. Isn't it true, Mr. Conlee, that one reason and the principal reason that you did not offer Damschen employment when business picked up was because he had taken this matter up with the union? A. I don't think that that was a particular reason. I think it may have had some bearing on it.

"Q. Well, that was one of the reasons, wasn't it? A. Not the particular reason, no.

"Q. Well, was it a reason? A. I would not say it was a reason.

"Q. The only reason that you can offer then is that you just did not want him? A. Yes, sir.

"Q. You did not like Damschen? A. Oh, I had nothing particularly against him.

"Q. You just did not want him to work for you? A. Just did not want him to work for me.

"Q. And yet his work was quite satisfactory? A. Yes, quite."

 The finding of the Board that Damschen was discharged because of union membership and activities is supported by substantial evidence. Under the National Labor Relations Act it is the province of the National Labor Relations Board, and not the courts', to appraise conflicting evidence, to determine the credibility of witnesses and the weight to be given their testimony, of drawing inferences from established facts and circumstances, and of

determining the facts. When the findings of the Board are supported by substantial evidence, they must be sustained.

In its most recent pronouncement on the subject the Supreme Court, in the case of National Labor Relations Board v. Nevada Copper Corp., 316 U.S. 105, 106, 107, 62 S.Ct. 960, 961, 86 L.Ed. 1305, said: "We have repeatedly held that Congress, by providing, § 10(c), (e) and (f), of the National Labor Relations Act, [29 U.S.C.A. § 160(c, e, f)], that the Board's findings 'as to the facts, if supported by evidence, shall be conclusive', precludes the courts from weighing evidence in reviewing the Board's orders, and if the findings of the Board are supported by evidence the courts are not free to set them aside even though the Board could have drawn different inferences. [National] Labor [Relations] Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368, and cases cited; * * *."

In this case the evidence adequately sustains the findings, and the order of the Board must be enforced.