## NATIONAL LABOR RELATIONS BOARD v. SECURITY WAREHOUSE & COLD STORAGE CO.

### No. 10182.

Circuit Court of Appeals, Ninth Circuit.

Aug. 17, 1943.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, Louis Libbin, William J. Avrutis, and Colonel C. Sawyer, Attys., N. L. R. B., all of Washington, D. C., for petitioner.

W. W. Jacka, of San Jose, Cal., and Rogers & Clark, Webster V. Clark, Leslie C. Rogers, and John H. Painter, all of San Francisco, Cal., for respondent.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

Respondent is a California corporation with business offices at San Jose, California. Its principal business is cold storage and pre-cooling of fruits and vegetables and the manufacture and sale of ice. It has a plant at San Jose, also one at Santa Clara, and in addition operates by lease about ten field warehouses at various points in California. Respondent hires about forty regular employees during the entire year. During the "cherry season" which extends from the latter part of May for about a month, respondent employs a considerable additional number of seasonal workers. It again engages a number of seasonal employees from the latter part of July to the end of the year in the business of receiving, storing, cooling and shipping pears, grapes, other fruits and some vegetables. During the year 1938 the total peak force at both plants was 277 men and in 1939 it reached 351.

The International Longshoremen's and Warehousemen's Union, Local 1-6, affiliated with the Congress of Industrial Organizations hereinafter called the union filed charges and amended charges against respondent. The National Labor Relations Board issued its complaint on December 27, 1939, alleging that respondent had engaged in and was engaging in unfair labor practices within the meaning of § 8(1), (2) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1–3).

The Trial Examiner filed his Intermediate Report on June 14, 1940. He found that respondent had engaged in and was engaging in unfair labor practices within the mean of § 8(1) and (2) of the Act, with respect to the formation and administration of Security Employees' Association, herein called the Association, a labor organization. Because the Trial Examiner declined to believe the testimony of certain witnesses he further found that respondent had not engaged in and was not engaging in unfair labor practices in other respects enumerated in the complaint.

Later the matter came before the Board which found as did the Trial Examiner that respondent had dominated and interfered with the formation and administration of the Association, and had contributed support thereto within the meaning of § 8(2); but went further and based upon the testimony which the Trial Examiner had expressly discredited found that the respondent had discouraged membership in the union by discriminating in regard to hire and tenure of employment of thirteen employees, within the meaning of § 8(3) and that it had interfered with, restrained, and coerced its employees in the exercise

of their rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157, thereby violating § 8(1). The Board further found that a strike commencing August 25, 1939, was caused by respondent's unfair labor practices.

The Board ordered respondent to cease each of the specified unfair labor practices; that it withdraw recognition of the Association; and that it offer employment with remedial back pay to those discriminated against; that it offer reinstatement to the striking employees, placing those for whom employment is unavailable upon a preferential hiring list; and that it post appropriate notices.

That the Act is applicable to respondent's business is not questioned here.

The officers and supervisory employees most frequently referred to in the evidence are J. S. Patton, president; George A. Miller, superintendent; Quintin Johnstone, superintendent of the Santa Clara plant; George H. Ballantyne, assistant secretary and manager; G. R. Beard, assistant superintendent; W. W. Jacka, attorney; F. M. Byl, another assistant superintendent; Stenger, Gates, Elderton, Purdy and McCormick, all foremen.

Among the employees who were witnesses and whose testimony is herein particularly referred to were Messrs. Murphy, Burkhardt, Tomlinson, Flores, Alvarado, Evatt, Christensen, Gularte, Nunes, Perry, Frayer, Hesse, Kelly and Dietrich.

Domination, Interference with and Support of the Association in Violation of § 8(1) and (2).

An active campaign to have respondent's employees join the Warehousemen and Cereal Workers' Union, Local 38-44 of the International Longshoremen's Association and an AF of L affiliate, herein called the I.L.A., was staged during March, 1937. To circumvent the organization of its employees by this or any outside labor union respondent's officials and supervisory employees brought about the organization of the Association whose policies and activities were directed and dominated by these officials and supervisory employees.

Superintendent Miller announced to the assembly of employees that President Patton thought that employees of respondent at the different plants should form one association. He said petitions for the formation of such association would be made available for signatures. Thereafter, Assistant Superintendent Beard, Shipping Clerk Green and Foreman Stenger drafted a petition which was circulated. Assistant Superintendent Byl secured most of the signatures at the Santa Clara plant and Assistant Superintendent Beard was active in soliciting the members to sign at the San Jose plant. Other supervisory officials and foremen were also active on behalf of the Association. The Association was organized with the assistance of the respondent's attorney. Beard, Byl and Purdy, all employed by respondent in a supervisory capacity, were elected president, vice-president and secretary-treasurer respectively. Three of the four men appointed on the committee to formulate by-laws and four of the five men appointed as an arbitration board to handle grievances likewise held supervisory positions with respondent.

These facts are substantiated principally by the testimony of witnesses Murphy and Burkhardt. They were contradicted by Miller and other officers of respondent. The Board believed Murphy and Burkhardt. Foreman McCormick testified that Byl solicited him for his signature, saying that the Association was being organized "so we won't have to go into a union."

Supervisory employees completely dominated this company Association. They prepared the by-laws and submitted them to Patton, Ballantyne and Secretary Dodson, and reported to the Association that "representatives of the company expressed the attitude as being extremely favorable to the employee's association and the laws [i.e. by-laws]." The Association met mostly on respondent's property and paid no rent. Through its Arbitration Board the Association negotiated with respondent from time to time but did not succeed in obtaining a signed agreement in any matter relating to wages, hours or seniority or other working condition although respondent did issue a statement or write a letter setting forth its policies in respect to various demands. The Board found that the plan of the Association originated with respondent's officers and that by means of the Association respondent intended to prevent the organization of its employees by any outside labor union.

Murphy testified that Beard told him to sign the petition for the company association and that if he did not he could expect little seasonal employment. Tomlinson testified that Beard and Elderton said substantially the same thing to him. The making of the statements was denied. **The**

Board· believed Murphy and Tomlinson. With respect to the Santa Clara ·plant, employees Smith and Flores testified that Byl, assistant to the superintendent, made substantially the same statements to them. Byl denied it. The Board believed Smith and Flores. Subsequently, Murphy and Burkhardt were discharged. Witness Tomlinson, an employee, testified that after this discharge Dodson gave Miller a petition to be signed by the employees stating that they refused to work with Burkhardt and Murphy, that Miller showed the document to him and that subsequently Dodson took up the statement, saying that respondent's attorney had advised respondent not to prepare the statement. Miller and Dodson denied that this document was as claimed by the witness but said it was an explanation as to why they subsequently reinstated Murphy and Burkhardt, but the Board believed Tomlinson. As corroborating Tomlinson it was testified that after the matter related by him had occurred Beard, Purdy and other supervisory officers of respondent sought to accomplish the same purpose through action by the Association.

Based upon these facts the Board found that respondent's supervisors and foremen dominated the policy of the Association, interfered with its administration and its affairs in violation of Section 8(1) and (2).

 The Act was violated by respondent's causing the formation of the Association, by interfering with its administration and by contributing to its support. "It is the purpose of the statute to see that the employer does not interfere or intrude into the affairs of the employees." Rapid Roller Co. v. N. L. R. B., 126 F.2d 452, 457; N. L. R. B. v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 248, 250 and 251, 60 S.Ct. 203, 84 L.Ed. 219; N. L. R. B. v. Grower-Shipper Vegetable Ass'n, 9 Cir., 122 F.2d 368.

### Interference, Restraint and Coercion.

In March, 1937, witnesses Burkhardt and Murphy, regular employees of respondent, and Tomlinson and Evatt, seasonal workers, joined the I.L.A. About that time, Miller, respondent's superintendent in charge of cold storage operations at San Jose, told Murphy, so Murphy testified, "* * * it wouldn't be profitable to have a union tell us how to run our business and we are the ones that pay you and the union would take your money and they are just a graft * * * as long as I am boss here there

will be no union." Miller denied making the statements. The Board believed Murphy.

On April 3, 1937, employees Tomlinson and Evatt were laid off by Miller. Tomlinson testified that on that day, Green, a shipping clerk in San Jose, told him that he had been discharged for union activities. Thereafter Tomlinson and Evatt went to Miller to check on the statement and Tomlinson asked Miller "in regard to why he wasn't working? He told us it wasn't any of our business, that he was running the business there, and walked off and left us." The Board found Tomlinson's testimony to be credible. McCormick, a foreman at Santa Clara, testified that Ballantyne, respondent's general manager, shortly after the above incident referred to Murphy and Burkhardt in a profane manner and added, "I would· fire them if I wasn't afraid of getting into trouble with the National Labor Board." Ballantyne denied making the statement. The Board believed McCormick. The Board found that by the above related statements of Miller and Ballantyne, respondent had interfered with, restrained,.and coerced its employees in the exercise of rights guaranteed them by Section 7 of the Act within the meaning of § 8(1), and that also these acts constituted a violation of § 8(2).

During the latter part of 1938, Murphy and Burkhardt began to attend meetings of the I.L.A. They were discharged in November, 1938, but after a visit to respondent's office by a representative of the National Labor Relations Board, they were reinstated January 5, 1939. These two employees, as witnesses, testified that on January 17, 1939, Miller told them, "Boys, it has come to my ears that you are talking union and trying to organize around the plant. I want to warn you. This is a warning not to do anything like that around here. * * * Watch your step and if you don't, it will be too bad." Miller denied making the statement. The Board believed Murphy and Burkhardt.

On June 6, 1939, the local called the union was formed. The members agreed to wear the buttons the next day. On the following day, a substantial number of the employees wore their union buttons to work. Employee Christensen testified that Foreman Weldon, having found that he and another employee, Caraway, had joined the union, reported the fact to Miller, and Miller said, "There is nothing we can do

about it now. Go ahead and punch in." Weldon then said to them, "Well, this is the attitude you take toward the company. I guess the company will have something to say about this. From now on, there will be no more smoking * * * no more time for sharpening tools * * * no more time wasted from now on," that subsequently Weldon ordered his crew to remove their buttons and return them to Burkhardt, saying " * * * It is all right for you to belong to the union if you want to * * * but you can't belong to the union and work here. This is a non-union company." Caraway substantially corroborated this. Weldon denied making the statements. Miller denied that Weldon had said anything to him about the employees' union membership. The Board believed Caraway and Christensen.

Gularte, Nunes and Perry, also employees of respondent, testified that Stenger, a foreman, had told them they had better get rid of their union buttons or they would lose their jobs "or get the short end of everything." Employee Kelly testified that he heard Miller and Stenger tell Kerber and Elderton "that if they wanted to hold their jobs, they had better get rid of their [union] buttons," and that "if they had paid any money into Jack Burkhardt to join the union they had better go and get their money back or they would just be out." Employees Hesse, Nunes and Burkhardt who testified that they overheard all or part of the conversation supported in full or in part Kelly's testimony. Miller and Stenger gave different versions of the conversation. The Board believed Kelly.

Employees Hesse, Burkhardt, Alvarado and Evatt also testified regarding statements made by Miller to each of them indicating that men who were not members of the union would be given preference for employment and be better off than members of the union. Miller denied making the statements. The Board believed Hesse, Burkhardt, Alvarado and Evatt.

Tomlinson testified that in the latter part of July, 1939, Miller made a similar statement to him, Miller denied it. Christensen and Hesse testified that Miller made derogatory statements about the union. The Board believed Tomlinson, Christensen and Hesse.

In regard to the Santa Clara plant, the Board found that Superintendent Johnstone questioned an employee, Flores, about his union button and that Foreman Gates made anti-union remarks to employees Frayer and Dietrich. The Board also found that respondent hired eight college students as temperature men in order to avoid hiring members of the union and also that respondent had hired other college students to discourage membership in the union. The Board held that by these acts the respondent had interfered with, restrained and coerced its employees in the exercise of rights guaranteed them by § 7 of the Act within the meaning of § 8(1).

■ Respondent insists that even if these activities hostile to union organization were carried on by some of its supervisory employees, nevertheless there was no showing that they were authorized or ratified by the respondent and that it cannot be chargeable with responsibility therefor. Besides the evidence indicating that the officers were well aware of what was occurring the showing as to what the foreman did and said here comes well within the rule applied in International Ass'n of Machinists, etc., v. National Labor Relations Board, 311 U.S. 72, page 80, 61 S.Ct. 83, at page 89, 85 L.Ed. 474, where the court said: "To be sure, they were not high in the factory hierarchy and apparently did not have the power to hire or to fire. But they did exercise general authority * * * to translate to their subordinates the policies and desires of the management."

In National Labor Relations Board v. Pacific Gas & Electric Co., 9 Cir., 118 F.2d 780, at page 787 this court said: " * * * if a reasonable man, in the position of an employee, could conclude or infer that the acts and deeds of the supervisory officials represented the attitude of the employer, then the Board may find that such acts and deeds were the acts and deeds of the employer."

### Discrimination Against Seasonal Employees.

Stuart and Earland Williamson testified that when they applied for work, Miller advised them to look elsewhere because the respondent was anticipating labor trouble with the union and "had a bunch of college boys signed up." Miller denied the statement. The Board believed the Williamsons. Christensen testified that Green said in his presence that respondent expected more labor trouble at the Santa Clara plant than at San Jose and built dormitories at

Santa Clara in which to house college students on the job. Respondent hired a number of college students, among them being some Stanford football players. Respondent remodeled a shed to be used as a dormitory, charging nothing for rent and but 75 cents a day for meals which was less than cost.

The Board found that the evidence conclusively established that college students were given preferential treatment in the distribution of employment over seasonal employees, and that respondent had adopted and effectuated a policy of hiring such students to discourage membership in the union.

The Board found four classes of discriminations: (1) Cases where seasonal employees did not receive a fair share of the work; (2) cases where respondent failed to rehire union members during the pear season; (3) cases where employees were demoted; (4) outright discharge.

In the first class of cases, the Board found that Frayer, Dietrich, Cabral, Christensen, Andrews, Flores and Nunes were discriminated against with respect to the amount of employment they received, because of their membership in the union. In the second class, the Board found that respondent refused to rehire Hesse, Stuart Williamson and Earland Williamson because of their membership in the union. In the third class the Board also found that respondent demoted Murphy and Burkhardt thus discriminating against them in regard to the hire, tenure, terms and conditions of employment, thereby discouraging membership in the union. In the fourth class, the Board found that respondent discharged Crowder because of his membership in the union, thus discriminating in regard to his hire and tenure of employment, thereby discouraging membership in the union.

Under the National Labor Relations Act an employer who discriminates against certain employees because of the employees' affiliation with a labor union or because of activity in union organization is guilty of an unfair labor practice. Phelps Dodge Corporation v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271; National Labor Relations Board v. Grower-Shipper Vegetable Ass'n, 9 Cir., 122 F.2d 368.

Finally the Board found that the strike that occurred on August 25, 1939, was caused by the unfair labor practices engaged in by respondent. It issued the usual order requiring respondent to cease and desist from engaging in the unfair labor practices, and to reinstate with back pay the above named employees. It petitions for enforcement of that order.

The record of these proceedings comprises upwards of 3,000 pages. Because the Trial Examiner in a persuasive preliminary report to the Board made certain recommendations on disputed issues favorable to the respondent which the Board disregarded, we have examined the evidence submitted with care. We have not detailed the evidence offered by respondent which tended to discredit the testimony and to contradict the findings because these contradictions were for the Board to resolve and it was for it to determine the credibility of the witnesses. We have summarized enough of the testimony given in support of the complaint to show that it was more than a scintilla and that it was pertinent, substantial and adequate, if believed, to support the findings and order of the Board. The possibility of drawing either of two inconsistent inferences from the evidence does not prevent the Board from drawing one of them.

We can reverse the order of the Board only if we determine there is error of law or no substantial evidence to support the findings.

"* * * the Supreme Court, in the case of National Labor Relations Board v. Nevada [Consol.] Copper Corp., 316 U.S. 105, 106, 107, 62 S.Ct. 960, 961, 86 L.Ed. 1305, said: 'We have repeatedly held that Congress, by improving, § 10(c), (e) and (f), of the National Labor Relations Act, [29 U.S.C.A. § 160(c, e, f)], that the Board's findings "as to the facts, if supported by evidence, shall be conclusive", precludes the courts from weighing evidence in reviewing the Board's orders, and if the findings of the Board are supported by evidence the courts are not free to set them aside even though the Board could have drawn different inferences. [National] Labor [Relations] Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368, and cases cited.' " National Labor Relations Board v. Schaefer-Hitchcock Co., 9 Cir., 131 F.2d 1004, 1009.

The order of the Board is affirmed.

HANEY, Circuit Judge, did not participate in the consideration or decision of this case.