**NATIONAL LABOR RELATIONS BOARD**
**v. LETTIE LEE, Inc.**
No. 10382.

Circuit Court of Appeals, Ninth Circuit.
Jan. 29, 1944.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Owsley Vose and Eleanor Schwartzbach, Attys. National Labor Relations Board, all of Washington, D. C., and Maurice J. Nicoson, Regional Atty., of Los Angeles, Cal., for petitioner.

Sam Wolf and Leo Shapiro, both of Los Angeles, Cal., for respondent.

Before WILBUR and STEPHENS, Circuit Judges, and McCORMICK, District Judge.

McCORMICK, District Judge.

The National Labor Relations Board, hereinafter called the Board, petitions this court for enforcement of the Board's order dated November 9, 1942, directed to respondent Lettie Lee, Inc., its officers, agents, successors and assigns.[1]

It is conceded that at all applicable times respondent has been and continues to be engaged in business in and affecting interstate commerce within the meaning of the National Labor Relations Act, hereinafter called the Act.

Respondent, a California corporation, is engaged in the manufacture and sale of women's dresses at its plant in Los Angeles, California.

By answer to the Board's petition respondent asks that the order [2] under review be annulled and enforcement of the order denied totally or at least partially.

The order under review resulted from charges duly filed with the Board by International Ladies Garment Workers Union, Cutters Local No. 84, A.F.L. (hereinafter called the Union). After exhaustive hearings before an accredited examiner of the Board and upon the record which is before us, the Board found respondent to be engaged in specific unfair labor practices, in violation of fundamental rights [3] of the employees of respondent.

[1] 49 Stat. 449 et seq., 29 U.S.C.A. § 151 et seq.

[2] The Board substantially ordered respondent to cease and desist from its unfair labor practices; to bargain collectively with International Ladies Garment Makers Union, Cutters Local No. 84, A.F.L.; to offer reinstatement or placement upon a preferential list, with back pay, to three striking employees who were discriminatorily refused reinstatement; upon application, to offer reinstatement or placement upon a preferential list to three other striking employees who were discriminatorily refused reinstatement and who subsequently were offered and refused to accept reinstatement, with back pay from five days after date of any refusal of their applications for reinstatement, and to post appropriate notices.

[3] National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

Summarized, the Board's ultimate findings are: 1, that on and after July 22, 1941, respondent refused to bargain collectively with the Union in violation of section 8(5) and (1) of the Act; 2, that respondent discriminatorily refused to reinstate six employees who participated in a strike which was caused and prolonged by respondent's unfair industrial attitude violative of section 8 (3) and (1) of the Act, and 3, that in addition to specifications 1 and 2, the respondent in other ways interfered with, restrained and coerced its employees in the exercise of their rights specified in section 7 of the Act, in violation of section 8(1) thereof.

As to the charge of Unfair Labor Practices, the following situation is revealed by the record and has been found by the Board:

Lettie Lee, Inc., in its manufacturing operations employs approximately 110 persons in the actual production of its merchandise. Such workers are divided into several classifications, known generally as assorters, cutters, operators, pressers, examiners, drapers, designers, and other garment making activities.

In June or July, 1941, a campaign was inaugurated to organize the employees of non-union dress manufacturers in the Los Angeles area. Cutters Local No. 84 was active in the movement and attempted to interest cutters employed by respondent in organization. The cutters did not join the union at that time. Later, being dissatisfied with their wages, they presented to Sam Bothman, secretary-treasury and general manager of respondent, a request for a wage increase.

On June 11, 1941, at a meeting with the male cutters, which Bothman called apparently to discuss with them the requested wage increase, Bothman, according to the testimony of two cutters who attended the meeting, asked the assembled cutters how many of them belonged to the union or intended to join the union. Receiving no reply, he told the group of cutters that the union officials were a bunch of shysters who were not "out to help" the employees and who could do them no good. He warned the cutters that the union would "stuff this place full of cutters and keep you fellows from getting all the work you should, and you will have to split up with the new fellows we will have to put on." He also informed this meeting of cutters that he would have nothing to do with the union and stated he would "never sign a union contract" and that he would "sooner close up this place than operate under a bunch of shysters." He related a former personal experience he had had in dealing with a union when the cutters tried "to run the place" and as a result he had had to "clear out." He spoke of an impending strike in the industry, wanting to know the cutters' attitude toward it. He told the men he felt safe in talking to them and that he did not think they would join a strike if one were called. Bothman in his testimony at the hearings denied that anything had been said at the June 11, 1941 meeting about the Union, and two of the cutters, related to each other by marriage and who attended the meeting, one being head cutter and regarded by his fellow employees as their foreman in the cutting room of the respondent, and the other also a cutter, contradicted the testimony about Bothman's queries and derogatory statements concerning the union and union officials. The meeting of June 11, 1941 ended with Bothman's offering the cutters their choice of an increase in pay, necessitating the hiring of another cutter to avoid overtime work, or continuing the existing wage with the usual amount of overtime. He stated the latter plan would amount to more over the period of a year. A second meeting between Bothman and the male cutters was held on June 13, 1941, when the cutters decided to accept a raise of 15 cents per hour instead of the overtime proposal. The raise was given, effective immediately. The Board accredited testimony that Bothman warned the cutters to have no dealings with the Union and that the wage increase applied to them only and that they should say nothing about it to the rest of the employees of respondent. At this meeting Mr. Bothman admittedly asked the group of cutters present whether they belonged to the Union.

During June and July, 1941, the campaign to unionize the dress manufacturing plants in the Los Angeles area proceeded, and written request of the International Ladies Garment Workers Union (sometimes called International) to respondent for a conference regarding respondent's

employees was ignored by Lettie Lee, Inc. On July 21, 1941, as the result of contacts by an organizer of the union, and despite the importunities of Bothman, six of the male cutters of respondent visited the office of the union and four joined Local No. 84, two having previously become members. All six voluntarily executed written designations of International as their sole agent in collective bargaining with respondent. The following day at the organizer's request the attorney for the Union telephoned respondent's office, unsuccessfully seeking contact with Bothman, to arrange for a conference for the purpose of collective bargaining. An effort by an attorney for the union to reach Mr. Bothman the next day for the purpose was also ignored, although the attorney left word with the respondent's telephone operator of the union's desire to negotiate with respondent and stated that "if the company did not recognize the union, inasmuch as it represented the majority, there was a possibility of a strike, because of the company's unfair labor practices." The attitude of the respondent regarding the union demands to bargain collectively caused the strike committee of International to include respondent in a strike called on July 24, 1941 against dress manufacturers in Los Angeles. Approximately twenty employees of Lettie Lee, Inc., including the six union cutters, went out on strike. On the day the strike was called Bothman appeared at a nearby cafe frequented by respondent's employees and informed several of the union cutters who had gathered there that he was surprised they had "struck" and that he thought they were a "bunch of fools;" that they should not be "chumps" and that "any of you who want to come back to work, come back with me right now."

During the first two days of the strike the union's attorney made several further attempts to talk to Bothman by telephone, all unsuccessfully. He reiterated to respondent's telephone operator his desire that Bothman speak to him or to some other representative of the union with respect to "entering into a bargaining relationship" and informed the operator that Bothman's failure to respond to his calls "aggravated the situation."

Two days after the strike was called Bothman telephoned one of the union cutters on strike asking him to return to work and stating that he was surprised that the cutters had gone on strike because he had treated them "all right." According to the testimony of this employee Bothman told him in the course of the conversation that "those shysters up there, they can't do anything for you. They are just looking out for themselves * * *. The rest of the boys are working * * *. Some of them are coming in Monday to work for me * * *. I want you to come in." The same witness testified that Bothman further said that "If he had to sign up with the union that night he would close up; Lettie Lee (respondent's president) would go to Texas, and he would open another shop, or do something." Later on, while three of the striking cutters were on the picket line, Bothman said he would have nothing to do with "those shysters up there." He wanted the three to come back to work as individuals, and when asked if the other three union cutters on strike would also be taken back to work in the plant Bothman stated he would not take any of them back as one was an ex-convict and the others were trouble makers and "stinkers."

About a month after the strike began one of the striking union cutters, upon invitation of respondent's foreman and chief cutter, visited the latter's home. The foreman stated that a full crew was working in the cutters' room but that he wanted the man on strike to return to work. This man replied that if he came back it would be with the rest of the striking cutters, whereupon the foreman replied, "That will never happen. You fellows haven't got a chance. I better let you know now—the union is going to drop you in a couple of weeks. I have the inside information, and I know that the union is going to drop you in a couple of weeks, and you won't be able to get a job anywhere in town. You will be blacklisted." The foreman also said that Bothman "would never sign a contract, he would close the shop first." This statement he subsequently substantially made to another striking cutter who had been asked to return to work and who replied that the cutters were not going to work except as a group.

■ Respondent is accountable for the conduct of its supervisory employee in contacting the striking employees even though the acts and statements of the chief cutter might not be attributable to the respondent on strict application of the rule of respondeat superior. International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; H. J.

Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309.

In early September, 1941, the attorney for the union twice wrote letters to respondent requesting bargaining with the union and reinstatement of the striking employees. These importunities also were unheeded and ignored by the respondent corporation.

■ The record before us reveals other instances and acts chargeable to respondent indicating hostility and resistance to the rights of employees to self-organization, to join and assist labor organizations and to bargain collectively through representatives of their own choosing, but we consider it unnecessary, and an unwarranted extension of this opinion to further detail such matters. It is sufficient to say that from the entire record before us the findings and conclusions of the board as to unfair labor practices in violation of section 8(1), (3) and (5) of the Act are sufficiently supported by substantial evidence.

■■ There are contradictions and conflicts in the testimony but the Board and not this court on review of the Board's order has the function of appraising the conflicting evidence and the power to determine which line of testimony it will accredit. The findings show that the Board resolved the conflicts in the testimony and drew the inferences from the evidence adversely to respondent. The Board based its factual determination on the totality of respondent's conduct as the Board found it to have been established by the evidence, and as such determination cannot be held, under the record before us, to have been arbitrary and without substantial evidential support, judicial disturbance of the Board's findings is therefore unauthorized under the law.[4]

The Appropriate Bargaining Unit and the Union's Majority.

■ The unit found by the Board to be appropriate under Section 9 of the Act, Title 29, section 159, U.S.C.A., consists of all the cutters, slopers and trimmers, excluding supervisory employees in respondent's plant. This determination being neither arbitrary nor capricious is binding upon this court.

The record shows and the Board found that the employees classified as slopers and trimmers are also qualified cutters and as such are eligible for membership in the Local 84, and that the other production employees of respondent are ineligible to membership therein.

Exclusive of office and clerical help and other employees engaged in non-productive functions, Lettie Lee, Inc., employs approximately 110 persons. 12 persons constituted the entire force of cutters in respondent's factory. They work in a separate part of the plant called the cutting room. This room is situated in an area partially enclosed by a partition approximately seven feet high which does not extend to the ceiling. The partition is open at one end for access to and from the rest of the plant. In the cutting room there are placed cutting tables and shelves upon which materials to be processed are kept. The tools and instruments used by the cutters in the performance of their duties are also kept in this partitioned-off and separated area, and the cutters' operations on the dresses manufactured by respondent are all performed in this separate part of the plant. There are five other employees, not qualified cutters and who perform no cutters' duties, working in the cutting room. Altogether the working force in the cutting room comprises 17 persons. Inasmuch as only qualified cutters are eligible to membership in Local No. 84, consequently the Union in its campaign to organize the employees of Lettie Lee, Inc., directed the movement to respondent's cutters exclusively. The record shows that the Union is the only labor organization that sought recognition as the representative of respondent's cutters and there is no showing that respondent's other production employees have any desire for affiliation with the Union or any other labor organization.

■■ In the count of qualified cutters the Board correctly excluded the five cutting room workers known as assorters or bundlers and a stock girl who performed

[4] 29 U.S.C.A. § 160(e) and (f); N. L. R. B. v. Nevada Consol. Copper Corp., 316 U.S. 105, 107, 62 S.Ct. 960, 86 L. Ed. 1305; N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; N. L. R. B. v. Security Warehouse & Cold Storage Co., 9 Cir., 136 F.2d 829, Aug. 17, 1943; N. L. R. B. v. Montgomery, Ward & Co., 9 Cir., 133 F.2d 676, 146 A.L.R. 1045; N. L. R. B. v. Schaefer-Hitchcock Co., 9 Cir., 131 F.2d 1004; N. L. R. B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780; N. L. R. B. v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138.

no cutter's services and who were not qualified to do so, and two others, one being known as the foreman of the cutting room and a supervisory employee of the respondent, and the other a brother of the president of Lettie Lee, Inc., who had left the employ of respondent prior to January 1, 1941, for an indefinite period of time because of his health and who did not return to work until December, 1941. During his absence this cutter was not carried on the payroll of respondent. The ten qualified cutters constituted a group of specialized craftsmen in respondent's plant who render services requiring different performance and skill than those of the other production employees in respondent's plant. There is, therefore, a basis of differentiating between the qualified and actual cutters in respondent's plant and other production employees of respondent in the ascertainment of an appropriate bargaining unit. The right of collective bargaining is a fundamental right of employees and the cutters in respondent's factory cannot be denied this right because the other production employees are not organized and, evidently from the record before us, have no desire to assert collective rights guaranteed by Section 7 of the Act.

The Board upon the basis of the differentiation between the type of work performed by the cutters and the rest of respondent's production workers, the extent of organization in the plant, the ineligibility to membership in Local No. 84 of any production employees of respondent other than qualified cutters and the absence of any desire by other production employees of respondent for membership in the Union, or any other labor organization, rejected respondent's contention that all production employees of respondent, or at least all cutting room employees, constituted an appropriate bargaining unit.

■ The choice of an appropriate unit for collective bargaining is one for the official judgment of the Board and unless the decision of the Board as to the appropriate unit passes the bounds of permissive discretion of the administrative body in the particular case, the court cannot interfere in such matter.[5] The situation, found by the Board in respondent's factory warranted

the Board in the exercise of its discretion in choosing the qualified cutters as an appropriate bargaining unit.

The respondent disputes the majority status of Local No. 84 and argues that certain employees were improperly classified as being within or without the unit.

We have already considered the action of the Board in excluding two cutters from the count of qualified employees in ascertaining the composition of the appropriate bargaining unit for the cutters of respondent. We have also adverted to the warranted finding of the Board as to the ineligibility of five employees in the cutting room to membership in Local No. 84 and to their lack of qualifications to be classified as cutter employees of respondent.

■ Thus the Board correctly found and concluded that the appropriate unit for collective bargaining is composed of ten non-supervisory qualified cutters in respondent's plant. Six of such employees being members of the Union and constituting a majority of respondent's employees in the appropriate unit, the Union is indisputably invested with the statutory authority reposed by Section 9 (a) and (b) of the Act, Title 29, Section 159 (a) and (b), U.S.C.A., as the exclusive representative of all employees of respondent within the unit.

Respondent does not deny that it has refused to bargain collectively with the Union. Indeed it could consistently, under the record before us, make no such claim.

■ The steadfast indifference to the proposals and solicitations by the representatives of the Union repeatedly made to respondent beginning July 22, 1941 and continuing into the early part of September, 1941, demonstrates a determination by respondent to avoid any arrangement for collective bargaining negotiations, and in the light of respondent's general attitude reflected by the evidence the Board was warranted in the inference that the failure to bargain collectively was attributable to respondent's opposition to the principle of collective bargaining rather than to any doubt by respondent as to the appropriateness of the specified unit claimed by the Union for collective bargaining functions.[6]

[5] Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251; N. L. R. B. v. Sunshine Mining Co., supra; N. L. R. B. v. Carlisle Lumber Co., supra; N. L. R. B. v. Botany Worsted Mills, 3 Cir., 133 F.2d 876; Marlin-Rockwell Corp. v. N. L. R. B., 2 Cir., 116 F.2d 586.

[6] N. L. R. B. v. Biles-Coleman Lumber Co., 9 Cir., 98 F.2d 18.

We think that the affirmative action required in subsection (a) of section 2 of the order under review is warranted.

■ The record before us also warranted the finding by the Board that the respondent's resistance to collective bargaining requests by the representatives of the Union caused the respondent's plant to be included among the places in which the Union called a strike which began July 24, 1941.

As the strike was also prolonged by the unfair labor practices found by the Board upon substantial evidence to have been committed by respondent, the refusal to reinstate the striking employees after demand to do so on September 10, 1941, warranted the Board's finding that respondent had engaged in anti-union discriminations in hire and tenure of employment, violative of employees' rights guaranteed by Section 7 of the Act and such finding justified the affirmative requirements of reinstatement of striking employees as stated in subsections (b), (c), (d) and (e) of Section 2 of the order under review.[7]

Respondent's brief stresses a contention that reinstatement is unwarranted under the record before us of one of the striking employees who admittedly had been convicted of grand larceny in 1936. The respondent had no knowledge or information of this employee's conviction of crime until a few days after the strike in which this employee walked out along with his five fellow members of Cutters Local No. 84. He had been working continuously for respondent for twenty odd months and the record is devoid of any dissatisfaction by respondent with his work or conduct in the plant during such period. He had been one of the first of the cutters in respondent's employ to join the Union, having become identified with it in the early stages of the labor organization activities of the Union relative to dress manufacturers in the Los Angeles area, and throughout the efforts of the Union to organize the cutters in respondent's employ he had been interested in the movement. The offense of which the employee was convicted had no relationship to respondent or to any of respondent's indus-

trial problems.[8] The conviction took place in the State of Wisconsin where the sentence of 15 months was imposed and served.

■ An illuminating circumstance on respondent's reason for refusing reinstatement to any striking employee, including the one under consideration, was the respondent's persistent stand shown by the record that reinstatement of any employee who had gone out on strike would be solely as an individual and that no recognition whatever would be accorded to the Union or to the striking employees as a group represented by the Union. This attitude warranted the Board in finding that the criminal record did not motivate respondent's refusal to reinstate the employee under consideration. It warranted an inference which the Board drew that respondent was seeking to rid itself of some of the strikers, including this one, completely.

We conclude that in the light of the entire record before us we are unable to say that the Board transcended its discretion and acted arbitrarily or capriciously in ordering reinstatement of the striking employee notwithstanding his criminal record.[9]

■ We find no merit in respondent's argument that the Board's findings in this proceeding, pertaining to expressions of opinion by supervisory personnel of respondent, are violative of freedom of speech rights guaranteed by the Constitution of the United States.

The hostile statements concerning the Union found by the Board to have been made by such agents of the respondent to its employees coupled as they are with respondent's continuous opposition and resistance to collective bargaining, and with threats to close its plant in the event of its unionization, in effect passed beyond mere expressions of opinion and amounted to interference with, restraint and coercion of employees in the exercise of rights under the National Labor Relations Act.

■ In determining whether a course of conduct amounts to restraint or coercion under the Act, pressure exerted vocally by the employer upon the employee may no

[7] Title 29, § 160(c), U.S.C.A.; Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217.

[8] Compare N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599.

[9] See N. L. R. B. v. Oregon Worsted Co., 9 Cir., 96 F.2d 193, 195.

more be disregarded in appraising a situation of industrial relations than pressure that is exerted by other means.[10]

The final contention of respondent is that the Board's petition to enforce the order under review should be denied because the petition fails to allege that respondent is in default and has not complied with the order.

We think respondent in such an argument misconceives the scope of the court's function in the instant proceeding because if the Board's order was proper on the record before the Board, and we so hold, the Board is not required to litigate in this court issues of fact as to whether the respondent has complied with the order, as a condition to obtaining an enforcement decree.[11]

The order of the Board will be enforced.

---

[10] N. L. R. B. v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; International Ass'n of Machinists v. N. L. R. B., 311 U.S. 72, 61 S. Ct. 83, 85 L.Ed. 50; N. L. R. B. v. Sunshine Mining Co., supra.

[11] Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718; N. L. R. B. v. Biles-Coleman Lumber Co., supra; N. L. R. B. v. L. H. Hamel Leather Co., 1 Cir., 135 F.2d 71; N. L. R. B. v. Swift & Co., 8 Cir., 129 F.2d 222.