**NATIONAL LABOR RELATIONS BOARD.**

v.

**PECHEUR LOZENGE CO., Inc.**

No. 53, Docket 22698.

United States Court of Appeals
Second Circuit.

Argued Nov. 12, 1953.
Decided Dec. 31, 1953.

Frederick U. Reel, George J. Bott, David P. Findling, A. Norman Somers and Abraham Siegel, Washington, D. C., for petitioner.

Morgan, Lockwood & L'Heureux, New York City, for respondent; Walter Gordon Merritt, Alfred J. L'Heureux and Henry Clifton, Jr., New York City, of counsel.

Before SWAN, FRANK and MEDINA, Circuit Judges.

MEDINA, Circuit Judge.

The Company is engaged in the manufacture, sale and distribution of candy lozenges and related products. Some of the products of the Company are sold in bulk and some are wrapped in individual consumer packages. In its plant the Company employs two classes of em-

ployees, male production workers and female wrappers. The Company experiences slack and busy seasons in the noral course of its operations. The busy season, attributable in large measure to St. Valentine's Day, begins in late summer or early fall and lasts until February. Production for the Valentine season consists principally of candy hearts sold in bulk, which require no wrapping. The normal work day and work week for the production employees during that period is consumed largely by the production of Valentine hearts in bulk. Thus, if the wrappers are to have any work to do there must be some overtime work by the production employees. The Company's policy of many years' standing has been to require such overtime work by production employees during the busy season, and such requirement is a part of each employee's contract of hire. The Company operates within a limited manufacturing space, and with a limited amount of expensive machinery. In November and December 1949, the Company employed approximately 70 female wrappers and 30 male production employees.

During the fall of 1949 a majority of the Company's employees designated "65" The Wholesale, Retail and Warehouse Workers Union of New York and New Jersey, hereinafter called the Union, as their bargaining representative. On November 14 and 15, 1949, the Union, represented by its area director, Mrs. Esther Letz, and two organizers, met with the Company's president, Mrs. Irene Pecheur, and its attorney, Alfred J. L'Heureux. The Union stated that it had been chosen as bargaining representative by a majority of the employees and wished to discuss a collective bargaining contract. After the Company's representatives stated that they wanted to be certain of the Union's majority status, Mrs. Letz informed them that as the Union had not complied with the filing requirements of Section 9 of the Act, it could not petition the Board for an election. She suggested that an election be held under the su-

pervision of a priest and the Company accepted the suggestion.

The election was held on the following day and of the 101 votes cast 93 were for the Union and 8 against it. Immediately after the results of the election were ascertained the Company and the Union executed an agreement in which the Company recognized the Union as the sole collective bargaining agent of all the employees, with exceptions not here material, and agreed to meet and discuss the terms of a collective bargaining agreement.

The Company and the Union again met on November 22, 1949, and the Union submitted a form contract, which contained no wage demands. Mrs. Pecheur expressed the desire to consult a labor relations expert before committing the Company to an agreement, and the parties agreed to meet again a week later. On November 28, 1949, Mrs. Pecheur consulted one Leopold L. Balleisen, an industrial relations consultant. Balleisen questioned her as to why she had consented to an election when the Union was not in compliance with the Act and could not have secured a Board election. Mrs. Pecheur responded that she did not care that the Union was not in compliance so long as the employees wanted it, and stated that she was willing to bargain with it. Balleisen informed her that the Union was "known as one of the most pro-communistic unions in the country and very militant." Mrs. Pecheur was, according to Balleisen, "taken a little back" by this statement, but nevertheless said that "that would make no difference to her, so that she could get someone to advise her as to getting the proper contract under which she could live, that would make no difference."

The next day, November 29, 1949, Mrs. Pecheur and L'Heureux again met with Mrs. Letz and other Union representatives for what proved to be the last bargaining conference between the parties. Mrs. Pecheur resisted further negotiations on a contract on the ground that she could do nothing until the Com-

pany's financial statement was available. The Union pressed for agreement on other provisions of the contract, such as grievance and arbitration procedure, but Mrs. Pecheur protested that the most important contract item was "money," and she could discuss nothing until she had received her financial statement. The Union assured her that its wage demands would not be excessive. The meeting broke up with no agreement having been reached on any of the issues.

Meanwhile, because of a belief that the Company was utilizing overtime production to accumulate inventory in preparation for a strike, substantial employee opposition developed against overtime work. On Monday, November 28, 1949, the shop committee met and, without the knowledge of the Union leaders, decided to discontinue overtime production work.[1] The following day, November 29, 1949, the shop committee chairman, one Maximino Badillo, informed the production foreman, one Anthony Charles Bartulis, of the committee's decision. Later that day, after conferring with Mrs. Pecheur, Bartulis told Badillo that there would be no overtime work that night. Accordingly, almost all of the production workers ceased their day's operations at 4:30 p. m., the regular quitting time. However, five or six men remained to work overtime, cleaning the machines. Foreman Bartulis testified that these were nonunion employees, a fact that had come out in the course of a conversation with them that afternoon. On the following day, November 30, 1949, Bartulis again informed Badillo that the men need not work overtime, and only the few nonunion men remained to work after the 4:30 quitting hour.

On November 30, 1949, Mrs. Pecheur informed Badillo that unless overtime were resumed it would be necessary to lay off thirty of the wrappers, explaining again that overtime was customary with the Company during that season of

the year and that failure of the production workers to work overtime would inevitably result in a lack of work for the wrappers. Badillo replied that the shop committee was to meet again that night to consider the overtime question and he would inform Mrs. Pecheur of the decision the next morning.

That night the shop committee decided to continue its opposition to overtime and the next morning, December 1, 1949, Badillo so informed Mrs. Pecheur. Thereafter, Mrs. Pecheur, after consulting Balleisen, posted a notice discontinuing overtime, at the same time telling Badillo that she would have to lay off thirty wrappers.

Late that afternoon, Mrs. Pecheur in a telephone conversation with Mrs. Letz told her of the impending layoff caused by the cessation of overtime work. Mrs. Letz requested Mrs. Pecheur not to go through with the layoff plans since the shop committee's action was without Union sanction. She further stated that she was to meet with the shop committee that night and was confident that she could persuade it to reverse itself. Later that night the shop committee met with Mrs. Letz and agreed to resume overtime work. It instructed Mrs. Letz to notify Mrs. Pecheur of its decision.

The next morning, December 2, 1949, Mrs. Letz sought to convey the shop committee's decision to resume overtime work to Mrs. Pecheur, but was unable to reach her. Shortly before noon that day the Company laid off thirty wrappers in order of seniority. This was done by means of a notice clearly indicating that the necessity for the layoff arose from the refusal of the production employees to work overtime. Immediately following the posting of the foregoing notice the remainder of the employees walked out of the plant on strike.

A day or two after the strike began, the Union took steps to settle it. Mrs. Letz, who had been unable to notify Mrs. Pecheur of the shop committee's deci-

1. The shop committee was a committee composed of the Company's employees who were approved by the majority of their fellow employees. Its "main purpose" was "to discuss the overtime question."

sion to resume overtime work, telephoned L'Heureux, and gave him the information. L'Heureux, however, informed Mrs. Letz that the Company had retained a labor relations consultant and disclaimed any connection with the matter. On Monday, December 5, 1949, the Union's president sent the following telegram to Mrs. Pecheur:

"I am prepared personally to conduct negotiations with you looking toward the immediate resumption of operations. I am confident such a conference could quickly resolve all issues. Continuation of the dispute is of advantage to neither side. Won't you kindly respond by calling my private wire Oregon 3-5332 [to arrange] such discussion."

Upon receipt of this telegram Mrs. Pecheur consulted Balleisen and suggested that he communicate with the Union. Balleisen, who had previously counselled that it would be more politic for him to remain in the background, again demurred, stating that "it would be best that the union not know that I was in the picture, if [Mrs. Pecheur] wanted the people back to work." He then drafted a reply to the Union's telegram, which was mailed on December 7, 1949, over Mrs. Pecheur's signature. This letter, after reviewing events up to that point and accusing the Union of bad faith and trickery, dealt with the Union's request for a meeting as follows:

"You state that you are anxious to settle this matter. In view of all that has transpired to date and the fact that our faith in your union and its promises are badly shaken, we must have concrete proof of your good intentions in the future. Therefore, the following are the ways in which this matter can be settled.

"1. All the pickets and strike activities must cease and your union must agree in a letter to us, signed by you, that there will be no picketing, striking, slowdown or other change in the manner and quality of our production, until February 1, 1950. The reason for this date is that we will not have our accountants statements as to the final position of the company for the year 1949 available to us much before that time. We must have such information before we can bargain with you intelligently.

"2. If you carry out number '1' faithfully we will agree to confer with you after February 1st, 1950, but with the understanding that we are not committed to agree in advance to any of the clauses contained in your contract and with the further understanding that we are not obligated to accept any of your conditions.

"3. We will rehire employees as we need them during this period of truce purely on the basis of the needs of the company and who we think are of most benefit to us regardless of seniority in job.

"Until you are ready to meet our terms as stated above, we do not agree to confer with you or anyone else from your union. Any moral obligation we had to bargain with you in good faith no longer holds because of the trickery and actions of your union during the past week."

On the next day, December 8, 1949, the Union's president sent the following telegram to the Company:

"Your letter of December 7 provides a basis for settlement. I suggest that we meet to work out all the details. Just contact me as soon as possible at my office to arrange such a meeting."

Mrs. Pecheur again consulted with Balleisen, and upon his advice dispatched the following reply to the Union:

"Re your telegram of December Eighth no conference necessary you merely confirm in writing verbatim the three conditions in our letter of December Seventh."

Finally on December 13, 1949, the Union's president sent the following telegram to Mrs. Pecheur:

"You indicate no conference is necessary, so perhaps you will be

prepared to answer these questions by mail.

"1. Are you prepared to establish procedures for handling grievances through the Union between now and February 1st?

"2. Will disputed questions be submitted to arbitration rather than new stoppages of work?

"3. Will you give us in writing, persons you wish to reemploy in the order in which you will rehire them?

"4. Will you give us assurances that on February 1st, you will negotiate, in good faith and make an honest attempt to reach agreement?

"Please communicate your reply to the undersigned."

The Company did not reply to this telegram. Mrs. Pecheur took it to Balleisen, who told her, according to his testimony, that "the union was merely stalling by asking these questions and that no reply should be made to it."

During the exchange of correspondence thus described between the Company and the Union, the Company began recalling its laid off workers. On December 5, 1949, the Company sent letters to seven of the laid off wrappers recalling them to work on December 7. These recall notices were brought to the attention of Union officials, who decided that all of the employees, both the strikers and those who had been laid off, would report for work on the morning of December 7. Accordingly, that morning the entire work force marched to the factory, led by the Union organizers, and Mrs. Letz requested reinstatement of all the employees. Mrs. Pecheur, however, refused to reinstate at that time any employees other than those she had recalled. The Union acquiesced in Mrs. Pecheur's position, and the recalled employees were put back to work.

Thereafter, between December 5 and 14, 1949, the Company recalled all thirty wrappers who had been laid off on December 2. After returning to work all but six of the wrappers went out on strike. Three production worker strikers were recalled in December; however, they remained on strike and did not return to work. There were no further recalls of strikers until April 13, 1950. The strike which began on December 2, 1949, lasted until June, 1950, when the Union abandoned it.

On April 5, 1950, the Union complied with the provisions of Section 9(f), (g) and (h) of the Act. On April 6, 1950, the Union's attorneys sent the following letter to the Company:

"This is to advise you that Wholesale and Warehouse Workers Union, Local 65 has complied with the provisions of Sections (f) and (h) of the Labor Management Relations Act of 1947.

"On behalf of the union, we hereby demand an immediate collective bargaining conference with you for the purpose of negotiating an agreement.

"On behalf of your employees, we again demand immediate reinstatement. Please understand that this demand is unconditional."

Balleisen replied to this communication for the Company on April 11, 1950. In his letter, Balleisen questioned the Union's majority, stating that it was the Company's policy not to recognize any union until it was certified by the Board after an election. With respect to the request for reinstatement, Balleisen gave no specific response except to say that "As a matter of fact, we have repeatedly requested our former employees to return to work. They have failed to do so." He further questioned the good faith of the Union.

This letter of Balleisen's was answered by the Union attorneys on April 14, 1950, stating doubt that the Company's questioning of the Union's majority was raised in good faith; but declaring that the Union was prepared to supply evidence of majority and to enter into a consent election agreement or "to adopt any other method of establishing the Union's status, so long as it can be accomplished quickly."

Balleisen did not reply to this letter. A short time later Victor Rabinowitz, an attorney for the Union, telephoned Balleisen and the latter suggested that Rabinowitz get in touch with the Board and set a date for a conference at which a consent election could be discussed.

A conference between the Union and the Company under the auspices of the Board was held on May 5, 1950. The only issue between the Company and the Union at that conference concerned the composition of the list of employees who would be eligible to vote in an election. It was the Company's position that such list should comprise those employees then working at the Company's plant and in addition those employees whom the Company expected to be able to recall for work "in the reasonable future." The Union's position was that the list of eligible employees should comprise all those working for the Company prior to December 2, 1949.

Further discussion took place on or about June 1, 1950, but the parties remained in disagreement, the Union representative stating that the Union could not win an election if the Company's list of employees were to be the one utilized to determine eligibility to vote. There were no further meetings.

The litigation before the Board was initiated by a series of charges filed by individual employees in December 1949 (assigned Case No. 2–CA–1068 by the Board's Regional Office), alleging that the Company had violated Sections 8(a) (1) and (3) of the Act by (1) refusing to rehire an employee on or about November 25, 1949, after a disability layoff because of his activities on behalf of a labor organization, (2) having discharged twenty-seven employees on December 2, 1949 because of their activities on behalf of a labor organization, and (3) refusing reemployment to forty employees on December 7, 1949 because of their union activities.

On July 14, 1950, additional charges were filed by individual employees in the same case, repeating the latter two prior charges and, in addition, charging a refusal by the Company on or about April 6, 1950, to reinstate certain employees because of their membership in and activities in behalf of the Union.

It was not until September 28, 1950, that the Union itself filed any charge under the Act. On that date, the Union filed a charge (to which the Board's Regional Office assigned Case No. 2–CA–1607) in which it was alleged that the Company had violated Sections 8(a) (1) and (5) of the Act by reason of the Company's refusal to bargain collectively with the Union on or about April 6, 1950 and thereafter, although, the charge stated, the Union then represented a majority of the employees in a unit appropriate for bargaining.

On May 1, 1951, the foregoing cases were consolidated and a complaint was issued.

The Board's decision and order are reported at 98 N.L.R.B. 496. Upon the foregoing facts the Board found that the Union from and after November 16, 1949, was the bargaining representative of the Company's employees in an appropriate unit consisting of all of the Company's employees, exclusive of office and clerical employees, sales people, chauffeurs, guards and supervisors. The Board found that the Company violated Section 8(a) (5) and (1) of the Act by refusing to meet with the Union on and after December 7, 1949, and conditioning resumption of negotiations upon abandonment of the strike.[2] The Board also found that the Company further violated Section 8(a) (5) of the Act by refusing on April 11, 1950 to recognize and bargain with the Union as the exclusive bargaining representative of the employees in an appropriate unit.

The Board further found that the strike, which began as an economic strike on December 2, 1949, was converted into an unfair labor practice strike on December 7, 1949, when the Company refused to bargain with the Union and condi-

---

2. The trial examiner had found that the Company violated only Section 8(a) (1).

tioned resumption of negotiations upon abandonment of the strike. Accordingly, the Board found that on and after December 7, 1949, the strikers became unfair labor practice strikers and the Company was obligated to reinstate them when they unconditionally applied for reinstatement on April 6, 1950, displacing if necessary all replacements hired after December 7, 1949, to take the strikers' places. The Board therefore concluded that the Company discriminated against the strikers in violation of Section 8(a) (3) and (1) of the Act by its refusal to reinstate them on April 6, 1950. The Board also found that the Company violated Section 8(a) (1) of the Act by interrogating employees as to their membership in the Union.

The Board's order requires the Company to cease and desist from the unfair labor practices found and from in any other manner interfering with, restraining or coercing its employees in derogation of their rights under Section 7 of the Act.

Affirmatively, the order requires the Company to bargain collectively with the Union; to offer to reinstate those employees who were on strike on April 6, 1950, in so far as it has not already done so; and to make them whole for any loss of pay from April 6, 1950 (the date of the Company's refusal to reinstate them upon their unconditional application) to the date of the trial examiner's intermediate report, and from the date of the Board's decision and order to the date of the Company's offer of reinstatement.[3]

This case, except for the Board's finding that the Company violated Section 8(a) (1) of the Act by interrogating employees as to their membership in the Union, turns on one fundamental issue: Whether the Board properly found that the Company violated Section 8(a) (5)

and (1) of the Act by its refusal to bargain with the Union on December 7, 1949. If that finding is proper, then the Company's refusals to bargain on both December 7, 1949 and April 11, 1950, were unfair labor practices, and the strikers became unfair labor practice strikers who were entitled to reinstatement upon their unconditional application on April 6, 1950.

If on the other hand, the Board did not properly find that the Company's refusal to bargain on December 7, 1949 was unlawful, then the bargaining order should be set aside, and the case should be remanded to the Board to determine which of the strikers (who under this hypothesis were economic strikers) had been permanently replaced before they applied for reinstatement. See Kansas Milling Co. v. N. L. R. B., 10 Cir., 185 F.2d 413.

The Company attacked the validity of the Board's finding with respect to the Company's refusal to bargain on December 7, 1949, on both substantive and procedural grounds. Procedurally, the Company contended that the Board could not find an unlawful refusal to bargain on December 7, 1949 because (1) the Board's complaint was not based upon a timely charge alleging refusal to bargain, and because (2) the Board's complaint did not allege, and was not amended to allege, that the Company violated Section 8(a) (5) by its conduct on December 7, 1949. Substantively, the Company argued (1) that it was under no legal obligation to bargain with a union not in compliance with the filing requirements of the Act, and (2) that its conduct on December 7, 1949 did not constitute a refusal to bargain. We turn, therefore, to the procedural and substantive contentions raised by the Company with respect to the refusal to bargain on December 7, 1949.

The Board's machinery in unfair labor practice cases is set in motion by the

---

**3.** Since the trial examiner was of the view that the Union's request for reinstatement was not unconditional, he concluded that the Company had not discriminatorily refused to reinstate the strikers on April 6, 1950. The Board reversed this finding and, therefore, in accord with its normal practice, abated the back pay for the period between the date of the intermediate report and the date of its decision.

filing of a charge, which the regional office investigates, and on which it may issue a complaint. Section 10(b) of the Act, provides, however, "That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *." The Company contends that in this case the complaint could not properly allege an unlawful refusal on its part to bargain "since November 16, 1949," because no such violation was timely charged.

■ The allegation that the Company's refusal to bargain "since November 16, 1949," constituted a violation of Section 8(a) (1) of the Act was properly included in the complaint. This Court and other courts have rejected attempts, such as the Company makes here, to restrict the Board's complaint to the precise violations specified in the charge. N. L. R. B. v. Gaynor News Co., 2 Cir., 197 F.2d 719, certiorari granted, 345 U.S. 902, 73 S.Ct. 640, reargument ordered 345 U.S. 962, 73 S.Ct. 947; N. L. R. B. v. Dinion Coil Co., 2 Cir., 201 F.2d 484; N. L. R. B. v. Kobritz, 1 Cir., 193 F.2d 8; N. L. R. B. v. Kingston Cake Co., 3 Cir., 191 F.2d 563. In N. L. R. B. v. Dinion Coil Co., supra [201 F.2d 491], this Court held that "the complaint * * * may allege violations not alleged in the charge if (a) they are closely related to the violations named in the charge, and (b) occurred within six months before the filing of the charge." The record shows that a charge was filed with the Board on December 16, 1949, alleging that the Company "has engaged in and is engaging in unfair labor practices within the meaning of Section 8(a), subsections (1) and (3) of the National Labor Relations Act." Under the caption "Basis of the Charge," it alleges that "On December 7, 1949, the [Company] refused reemployment to the following [40] employees because of their union activities." The refusal to bargain alleged in the complaint and later found by the Board to be a violation of Section 8(a) (5)

and (1) of the Act, is primarily evidenced by the Company's letter of December 7, 1949, in which the Company refused to bargain unless the Union abandoned the strike. In this same letter, the Company stated that it would "rehire employees as we need them during this period of truce purely on the basis of the needs of the Company and who we think are of most benefit to us regardless of seniority in job." In the exchange of telegrams which ensued between the Company and the president of the Union, the latter requested on December 13, 1949, that the Company "give assurances that [if the strike was terminated, it would] negotiate in good faith and make an honest attempt to reach agreement," and also that the Company list "in writing, persons who wish to reemploy in the order in which you will rehire them." When the Company failed to reply to this telegram, the charge here in question was filed on December 16, 1949, alleging that the Company's conduct violated Section 8(a) (1) and (3) of the Act, and particularizing the violation as a refusal to reemploy certain employees on December 7, 1949, because of their union activities. In the light of all of these circumstances, it seems to us that the entire series of events, including the earlier refusal to work overtime, the resulting layoffs, the strike, the request for reinstatement and the refusal to bargain, are all closely interrelated. Within the ruling of this Court in the Dinion Coil case, the complaint in the case at bar validly alleged a refusal to bargain "since November 16, 1949," for that violation was "closely related to" the violations alleged in the charge filed on December 16, 1949, and "occurred within six months before the filing of the charge."

■ The Company's contention that the Board's complaint did not allege and was not amended to allege a violation of Section 8(a) (5) by reason of the Company's conduct in December 1949 is unfounded. It is difficult for us to understand the Company's contention that the Board's complaint did not allege a violation of Section 8(a) (5) of the Act, in

view of the allegations of paragraph 28 of the complaint. Paragraphs 21 and 26 of the complaint allege that the Company, "since November 16, 1949," has refused to bargain collectively with the Union as the exclusive representative of all the employees in an appropriate bargaining unit, and that, by this conduct, it did engage in and is engaging in unfair labor practices within the meaning of Section 8(a) (1) of the Act. Paragraph 28 of the complaint alleges that "The acts of [the Company], described above, constitute unfair labor practices affecting commerce within the meaning of Section 8(a) (1), (3) and (5) and Section 2(6) and (7) of the Act." It seems to us that paragraphs 21, 26 and 28 of the complaint, when read together, clearly allege that the Company's conduct in December 1949 violated Section 8(a) (5) of the Act. Moreover, the Board would not be precluded from finding that the Company's conduct in December 1949 also violated Section 8(a) (5), even though the complaint had only alleged that such conduct violated Section 8(a) (1). We think it would not matter that the complaint failed to mention a specific section of the Act, if the alleged conduct was in fact violative of that section. In American Newspaper Publishers Ass'n v. N. L. R. B., 7 Cir., 193 F.2d 782, 800, certiorari denied, International Typographical Union v. N. L. R. B., 344 U.S. 816, 73 S.Ct. 11, the Court held (reversing the Board) that "Where, as here, the complaint clearly describes an action which is alleged to constitute an unfair labor practice but fails to allege which subsection of the Act has been violated or alleges the wrong subsection, such failure or mistake, if it does not mislead the parties charged, does not prevent the Board from considering and deciding the charge so presented."

■ The Board correctly found that the Company was under a legal duty to bargain with the Union on December 7, 1949. Section 9(h) of the Act provides that " * * * no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 10, unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods. * * *" We think it is sufficient that the officers of the Union filed the required affidavits with the Board before the Union made its charge. It is implicit in the language of this section that the violation alleged in the charge may occur before the officers of the Union making the charge have filed the required affidavits. The circumstance that the Union had not complied with Section 9 (f), (g) and (h) in December 1949 does not excuse the Company's refusal to bargain with it. The refusal was based on grounds which were insufficient in the eyes of the law and was not premised upon the Union's failure to comply with the requirements of that section. As we have seen, as late as November 28, 1949, Mrs. Pecheur told Balleisen that neither the Union's non-compliance with the filing requirements of the Act nor its "pro-communistic" character "would make [any] difference to her," and that if the employees wanted the Union she was willing to bargain with it. In these circumstances, while failure to file the non-communist affidavits required by Section 9(h), and the financial statement and other reports required by Section 9 (f) and (g), bars a union from access to the processes of the Board, it does not necessarily destroy the Union's status as bargaining representative for purposes of Section 8(a) (5). West Texas Utilities Co. v. N. L. R. B., 87 U.S.App.D.C. 179, 184 F.2d 233, certiorari denied, 341 U.S. 939, 71 S.Ct. 999, 95 L.Ed. 1366; N. L. R. B. v. Tennessee Egg Co., 6 Cir., 201 F.2d 370, reversing 199 F.2d 95 on

the authority of N. L. R. B. v. Dant, 344 U.S. 375, 73 S.Ct. 375; N. L. R. B. v. Reed & Prince Mfg. Co., 1 Cir., 205 F.2d 131, 133. In the latter case, the Court held that "Congress has not made compliance with the filing requirements of § 9(f), (g) and (h) a condition precedent to the obligation of an employer under § 8(a) (5) to bargain collectively with the chosen representative of the employees".

This would seem to dispose of the contention of the Company that the charge as originally filed was by the individual workers and not by the Union. We are not here dealing with a phase of the technical common law doctrine of capacity to sue, but with a question of interpretation of a statute designed to ameliorate the relations between employers and employees by providing, among other things, for the peaceful disposition of labor disputes in a fair and impartial manner. The purposes of such legislation might well be nullified and subverted if a series of unsubstantial technicalities of procedure was permitted to stand in the way of a determination on the merits of the questions in dispute between the parties. Because the Union was not certified at the time of the occurrences in question the Union was not qualified to file the charge; of necessity it was made by the individuals concerned. Unless the authorities above cited are to be disregarded, the charge by the workers themselves must be considered as sufficient for the purposes now under discussion.

The Board correctly found that the Company's refusal on and after December 7, 1949, to negotiate with the Union concerning the settlement of the strike constituted a refusal to bargain collectively in violation of Section 8(a) (5) and (1) of the Act. The existence of a strike does not suspend the obligation on the part of the employer to bargain. In N. L. R. B. v. Remington Rand, Inc., 2 Cir., 130 F.2d 919, 927, this Court stated: "Nor does the fact of a strike of itself relieve the employer of his duty under the Act to bargain collectively with his employees." See also Black Diamond S. S. Corp. v. N. L. R. B., 2 Cir., 94 F.2d 875, certiorari denied, 304 U.S. 579, 58 S.Ct. 1044, 82 L.Ed. 1542. On the contrary, the need for carrying out that obligation when a strike is in progress is all the greater in order that a peaceful settlement of the dispute may be reached. As the Court stated in Jeffery-DeWitt Insulator Co. v. N. L. R. B., 4 Cir., 91 F.2d 134, 140, 112 A.L.R. 948, certiorari denied, 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565, "If an employer in the presence of a strike could rid himself of the obligation to negotiate by declaring further negotiations to be useless * * * the statute enjoining collective bargaining would largely fail of its purpose. We do not think that it can be brushed aside so easily."

The Company's insistence that the strike would have to be first abandoned before it would resume any negotiations with the Union, as evidenced by its letter of December 7, 1949, was also a violation of its statutory duty to bargain collectively. As we have seen, an employer may not justify a refusal to bargain because of the existence of a strike. Likewise, an employer may not condition his statutory obligation to bargain collectively upon an abandonment of a strike. This is but one phase of the fundamental rule that generally an employer may not lawfully demand, as a condition precedent to the performance of his statutory duty, an abandonment by employees of protected, concerted activities or a surrender of rights bestowed by the Act. In N. L. R. B. v. St. Mary's Sewer Pipe Co., 3 Cir., 146 F.2d 995, 996, the Court stated: "The duty to reinstate is not fulfilled by a conditional offer of reinstatement. The imposition of the condition which required the Union to abandon rights to which it was entitled under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., was an unfair labor practice." In N. L. R. B. v. George P. Pilling & Son Co., 3 Cir., 119 F.2d 32, 38, the Court stated that "Sec. 7 of the Act guarantees to the employees the right to bargain collectively through a representative of their own choosing and it is not for the employer to restrain or interfere

with the exercise of that right by insisting upon unwarranted conditions." See also Jeffery-DeWitt Insulator Co. v. N. L. R. B., supra; N. L. R. B. v. Poultrymen's Service Corp., 3 Cir., 138 F.2d 204. The strike here was a protected, concerted activity. See Firth Carpet Co. v. N. L. R..B., 2 Cir., 129 F.2d 633; N. L. R. B. v. Mackay Radio & Tel. Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; N. L. R. B. v. Lightner Publishing Corp., 7 Cir., 113 F.2d 621.

The Company also attacked the validity of the Board's findings that the Company further violated Section 8(a) (5) of the Act by refusing on and after April 11, 1950, to recognize and bargain with the Union as the exclusive bargaining representative of the employees in an appropriate unit, and that the Company discriminated against the strikers in violation of Section 8(a) (3) and (1) of the Act by its refusal to reinstate them on April 6, 1950, when they unconditionally applied for reinstatement. In this connection, the Company argued (1) that the Union did not, in April 1950, represent a majority of employees in a unit appropriate for bargaining and, therefore, the Company had no legal obligation to bargain collectively; and (2) that the strike, which began in December 1949, was at all times an economic strike, was not converted into an unfair labor practice strike, and, therefore, created no obligation to discharge replacements in order to reinstate strikers. We shall now consider these contentions made by the Company.

■ The Board properly held that the Company further violated Section 8(a) (5) of the Act by refusing on and after April 11, 1950, to recognize and bargain collectively with the Union as the exclusive bargaining representative of the employees in an appropriate unit. The Company contends that the Union did not, on April 11, 1950, represent a majority of employees in a unit appropriate for bargaining, and that consequently, the Company had no legal obligation to bargain collectively with the Union. This contention is without merit on the facts before us here. As we have seen, the Company unlawfully refused to bargain collectively with the Union on December 7, 1949. Under settled law, as the Company committed an unremedied unfair labor practice on December 7, 1949, when it wrongfully refused to bargain collectively with the Union, any subsequent loss of majority by the Union would be attributable to that unfair labor practice, and would not justify a refusal on the part of the Company to bargain on that ground. Otherwise, the Company would profit from its own wrongful refusal to bargain. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; N. L. R. B. v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380; N. L. R. B. v. Karp Metal Products Co., 2 Cir., 134 F.2d 954, certiorari denied, 322 U.S. 728, 64 S.Ct. 941, 88 L.Ed. 1564; ·N. L. R. B. v. Andrew Jergens Co., 9 Cir., 175 F.2d 130, certiorari denied, 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503. In N. L. R. B. v. George P. Pilling & Son Co., supra, the Court stated:

> "In no event could the employer discredit a duly designated bargaining agent by refusing to bargain with it and then avail himself of the bargaining agent's loss of majority support which has thus been brought about by the employer's own conduct."

■■ The Board correctly found that the strikers unconditionally applied for reinstatement on April 6, 1950, and that the Company discriminated against the strikers in violation of Section 8(a) (3) and (1) of the Act by its refusal to reinstate them on that date. The strike, which began as an economic strike on December 2, 1949, was converted into an unfair labor practice strike on December 7, 1949, when the Company unlawfully refused to bargain with the Union and· conditioned resumption of negotiations upon abandonment of the strike. N. L. R. B. v. Remington Rand, Inc., supra; Black Diamond Steamship Corp. v. N. L. R. B., supra; N. L. R. B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862,

certiorari denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540; N. L. R. B. v. St. 432; N. L. R. B. v. Lettie Lee, Inc., 9 Mary's Sewer Pipe Co., supra; Ritzwoller Co. v. N. L. R. B., 7 Cir., 114 F.2d Cir., 140 F.2d 243. The strikers, therefore, became unfair labor practice strikers, and the Company was obligated to reinstate them when they unconditionally applied for reinstatement on April 6, 1950, discharging if necessary all replacements hired after December 7, 1949, to take the place of strikers during the strike. N. L. R. B. v. Remington Rand, Inc., supra (both cases); Black Diamond S. S. Corp. v. N. L. R. B., supra. Although the trial examiner found that the strikers had not made an unconditional application for reinstatement, this finding is devoid of evidentiary support and was properly overturned by the Board. The Board correctly held that the Union's letter of April 6, 1950 was an unconditional application for reinstatement. It was sufficient, in our view, that the Union specifically stated that the demand for reinstatement was "unconditional." It was not incumbent upon the Union to go further and to spell out the plain intendment of the word "unconditional" by stating that this meant that the employees were abandoning their prior request for the elimination of overtime. We do not hold, however, that the mere use of the word "unconditional" will suffice, irrespective of the context and the attendant circumstances. Although the trial examiner suggests that the Union should have expressly indicated its abandonment of objection to overtime (the original cause of the layoffs which led to the strike), the record shows that the Union had long before advised the Company's counsel that "the people had voted to work overtime, were ready to work overtime."

■ This disposes of the failure to bargain and reinstatement phases of the case. We come now to consider the Board's finding that the Company violated Section 8(a) (1) of the Act by interrogating employees as to their membership in the Union. The incident relating to the alleged interrogation by the foreman of employees concerning their union membership occurred at a preliminary phase of the controversy and was of trivial consequence. Indeed, the record as a whole makes it far from clear that the information was not volunteered by the few employees with whom the single conversation complained of was had. We shall not enforce this part of the Board's order. See N. L. R. B. v. Montgomery Ward & Co., Inc., 2 Cir., 192 F.2d 160; N. L. R. B. v. Superior Co., 6 Cir., 199 F.2d 39.

As thus modified by the deletion of paragraph 1(a) the order of the Board will be enforced.