**ASSOCIATED HOME BUILDERS OF the GREATER EAST BAY, INC.,**
**Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 19381.**

United States Court of Appeals
Ninth Circuit.

Oct. 29, 1965.

Gardiner Johnson, Thomas E. Stanton, Jr., Johnson & Stanton, San Francisco, Cal., for petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Gary Green, Melvin J. Welles, Attys., N. L. R. B., Washington, D. C., for respondent.

Herbert S. Colton, Gen. Counsel, John J. Riley, Director of Labor, Washington, D. C., with Natl. Asso. of Home Bldrs. U. S., for amicus curiae Natl. Asso. of Home Bldrs.

Before POPE and BROWNING, Circuit Judges, and THOMPSON, District Judge.

POPE, Circuit Judge.

Petitioner, an association of builders of homes in what is called the "Greater Eastbay", which refers to the counties surrounding and near the San Francisco Bay in the State of California, filed a charge against the Bay Counties District Council of Carpenters and Joiners of America, AFL–CIO, and Shinglers Union, Local 478, International Brotherhood of Carpenters and Joiners of America, AFL–CIO, herein referred to as the Unions, stating that the Unions had engaged in an unfair labor practice under § 8(b) of the National Labor Relations Act by the imposition and exaction of fines on employee members of the Unions for exceeding production quotas imposed by the Unions in violation of the controlling collective bargaining agreements and that this conduct operated to restrain and coerce members of the Unions in violation of the rights granted by § 7 of the Act.

Following the filing of the charge the General Counsel filed a complaint which set out that the said Associated Home Builders was an association of employers engaged in the home construction industry and organized for the purpose, among others, of engaging in collective bargaining with the representatives of its employees and entering into collective bargaining contracts on behalf of its members. Appropriate allegations were made to show the Board's jurisdiction in the matter; that the Association was an employer and engaged in commerce and that the Unions mentioned were labor organizations within the meaning of § 2 of the Act.

The complaint then alleged: "On or about the dates set opposite their respective names, the Respondents jointly fined the following named employees, and on various unknown dates in 1961 and 1962 other unknown employees, for violation of a rule of the Respondents requiring that members of Shinglers who were employed by the employer members of Associated should not exceed certain production ceilings unilaterally established by the Respondents." Eight employees were named as persons who had been fined. The complaint also alleged that the Unions applied payments of dues made by the employees to the satisfaction of the fines. All of these actions were stated to have been unlawful and in violation of § 8(b) (1) (A) of the Act.[1] The acts of the defendant so described were alleged to constitute unfair labor practices affecting commerce.

After a hearing before the trial examiner, the examiner filed an Intermediate Report and Recommended Order in which he found that the Unions had adopted by resolution a rule imposing certain quotas or norms on the installation of shingles whereby each workman would install a minimum of so many units and would not exceed a specified maximum. Union officers thereafter charged certain employees with having laid shingles in excess of the production limitations and upon trial of the persons charged fines were imposed upon them. After notice to them, the sums paid by the union members as dues were applied to the payment of the fines. The trial examiner con-

---

1. "(b) It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * *." 29 U.S.C. § 158(b) (1) (A).

cluded that the transfer of dues payments to the satisfaction of fines would tend to restrain and coerce employees in the exercise of their rights guaranteed under § 7 of the Act since depriving the employees of the benefit of their dues payments might subject them to discharge from their employment.[2] The respondents were found to be engaged in unfair labor practices in violation of § 8 (b) (1) (A) of the Act, and it was recommended that a cease and desist order be entered with respect to transferring dues payments by members of the Unions to the satisfaction of union imposed fines, and with respect to threatening members with the requirement that they pay dues the second time, and that the Unions be required to post appropriate notices.

The report and recommended order was approved and accepted by the Board in its entirety. With respect to the portion of the order above described there is no controversy here and it is conceded that the finding that the application of dues to fines constituted an unfair labor practice was a proper one. The question which arises here, however, has to do with the failure of the examiner to go further and make recommended findings and orders with respect to the Unions' action in fining members for exceeding production ceilings or quotas unilaterally established by the Unions.[3]

The present petition to review and modify the order of the Board is based upon a similar contention, namely, that the Board should have held the Unions guilty of an unfair labor practice in fining members for exceeding production ceilings or quotas unilaterally established by the Unions. Not only did the Board, by accepting the limited order and recommendation of the trial examiner, refuse to make such holdings but it dismissed the portion of the complaint which alleged that the fining of the members for exceeding the production ceilings was in contravention of the Act. This is assigned as error on the part of the Board.

The record discloses without contradiction the following: The Bay Counties District Council of Carpenters and Joiners, one of the two Unions here involved, was the governing body controlling numerous local unions including Local 478. In substance, the District Council was the governing body of both Unions here involved. The District Council, on behalf of its member unions, entered into a collective bargaining agreement with Associated Home Builders, petitioners here, and other contractors, which was in force at the time of the attempted establishment of the production limitations and imposition of the ensuing fines.

The agreement's provision respecting working conditions was as follows: "It is agreed that the wages, hours and working conditions of this Agreement are the wages, hours and working conditions in the area covered by the Agreement." At the time of the execution of that collective bargaining agreement no production limitations such as those involved in this case were in effect.[4]

2. The contract between the employers and the Unions contained the usual union security clause.

3. The General Counsel excepted to the examiner's Intermediate Report and Recommended Order in the following particulars:
"(1) The Trial Examiner's failure to treat with the issue as to whether the Respondents' action in fining members for violation of the Trade Rules, standing alone, constitutes proscribed conduct, * * *. (2) The failure of the Trial Examiner to find, throughout as a conclusion of law, that Respondents violated Section 8(b) (1) (A) of the Act by fining employees (members) for exceeding production ceilings or quotas unilaterally established by Respondents. (3) The Trial Examiner's failure to include in his Recommended Order a requirement that Respondents cease and desist from fining or threatening to fine employees for exceeding production ceilings or quotas unilaterally established by Respondents and otherwise remedy said allegations."

4. About two years prior to August 9, 1961, Local 478, the shinglers union, gave notice of an intention to limit production of its members. The employers' volume dropped off, they laid off half their crew, and notified the Union that they would not

At its June meeting in 1961, Local 478 passed the resolution in question. This was formally approved in the same month by the District Council. The resolution was prepared for signature by individual members of the Union. It fixed the amount of shingles to be laid by a member of the Union in eight hours as six squares of wood shingles or shakes or thirteen squares of composition shingles and provided that members violating the provisions for limitation of work might be fined. The employers learned of it later and protested it.

The position taken by the employers was that their employees had been averaging 7½ squares per day; that the limitation of output would be contrary to the collective bargaining agreements; and that the limitation would add to the cost of building. It was stated by the union representative that the Unions' concern was based upon the complaints of a substantial number of union members that they could not keep up with faster men with the result that employers were not retaining the slower members on their payrolls.

Certain of the employees, members of the Union, were charged with violations of these limitations. They were tried for "pace setting by laying an excessive amount of squares per day." Some of them were fined, and two of them were notified, as previously indicated, that their dues payments were being applied to their fines.

The argument presented by the petitioner in support of its contention that the Board was in error in holding that the fining of these members for exceeding production quotas was not a violation of § 8(b) (1) (A) proceeds by two steps. Petitioner first says that these production limitation rules are not rules "with respect to the acquisition or retention of membership" within the meaning of the proviso to that section (see footnote 1, supra). It argues that this proviso only applies to the internal affairs of the union, such as rules requiring attendance at meetings, fixing election proceedings, regulating the calling of a strike, and the like. It contends further that the restrictions imposed by the Unions were intended to establish certain terms and conditions of employment and did not relate only to internal union affairs. Consequently, petitioner reasons, the proviso should not protect the union rule in this case.

The petitioner next contends that one right guaranteed to an employee under § 7 of the Act is a right to refrain from collective action. This right, it claims, entitles the union members to refuse to obey the production limitation. Arguing that a fine is coercive, it follows that the imposition of these fines operates to restrain or coerce these members in the exercise of their § 7 rights therefore constituting an unfair labor practice under § 8(b) (1) (A).

The petitioner appears to recognize that in § 8(b) (1) (A) Congress was aiming at means, not at ends, and that this section was directed against the use of physical force or threats of force or of economic reprisal. See National Labor Relations Board v. Drivers Local Union, 362 U.S. 274, 291, 80 S.Ct. 706, 4 L.Ed.2d 710. The argument is that the imposition of a fine amounts to economic reprisal.[5]

abide by the proposed limitation. After about three months the effort thus to limit production was abandoned.

5. Both parties have referred at length to the legislative history of this section. The section was inserted in the pending bill in the course of its consideration on the floor of the Senate, as a proposed amendment. Of apparent relevance are the remarks of Senator Taft quoted in National Relations Board v. Drivers Local

Union, supra, at pp. 287–288, 80 S.Ct. at p. 714, as follows: "The effect of the pending amendment is that the Board may call the union before them, exactly as it has called the employer, and say, 'Here are the rules of the game. You must cease and desist from coercing and restraining the employees who want to work from going to work and earning the money which they are entitled to earn.' The Board may say, 'You can persuade them; you can put up signs; you can

In affirming and approving the action of the Trial Examiner in ignoring these contentions of the petitioners, the Board relied upon its decision in Local 283, U.S.W. (Wisconsin Motor Corporation) 145 NLRB No. 109, reported in 1964 C.C.H., NLRB Dec. Para. 12,835. In the last named case the Board contented itself with the general statement that the provisions of § 8(b) (1) (A) could not be construed as intended to "interfere with the Union's internal affairs." It assumed that the Union's action in that case in imposing a ceiling upon what an employee might earn under a machine rate, and the imposition of fines for violation thereof, was merely an incident to "the right of a labor organization to prescribe its own rules with respect to acquisition or retention of membership." Board member Leedom filed a strongly worded dissenting opinion which would sustain the position taken by the petitioner in this case.[6]

It would appear that in making this reference to interference "with the union's internal affairs" in the Local 283 case, and by implication in this case, the Board was assuming that those cases presented facts within the meaning of the proviso to § 8(b) (1) (A) (see footnote 1, supra) relating to rules "with respect to the acquisition or retention of membership." For reasons which will presently appear, we think that proviso can have no application here.

In our search for court authority upon this point we have found but one case which would support the position taken by the Board in this case and in Local 283, supra.[7] That case is American Newspaper Pub. Association v. N. L. R. B., 7 Cir., 193 F.2d 782. In view of

---

conduct any form of propaganda you want to in order to persuade them, but you cannot, by threat of force or threat of economic reprisal, prevent them from exercising their right to work.' As I see it, that is the effect of the amendment. * * * The Senator says it will slow up organizational drives. It will slow up organizational drives only if they are accompanied by threats and coercion. The cease-and-desist order will be directed against the use of threats and coercion. It will not be directed against the use of propaganda or the use of persuasion, or against the use of any of the other peaceful methods of organizing employees. Mr. President, I can see nothing in the pending measure which, as suggested by the Senator from Oregon, would in some way outlaw strikes. It would outlaw threats against employees. It would not outlaw anybody striking who wanted to strike. It would not prevent anyone using the strike in a legitimate way, conducting peaceful picketing, or employing persuasion. All it would do would be to outlaw such restraint and coercion as would prevent people from going to work if they wished to go to work." 93 Cong.Rec. 4436.

6. The dissent expressed the opinion that fines levied by the Union against employees who violated the unilaterally promulgated production quotas constituted restraint and coercion within the meaning of § 8(b) (1) (A) of the Act citing the language used in National Labor Relations Board v. Drivers Local, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710. It was stated that the proviso to that section was not applicable here. Citing Allen Bradley Co. v. N. L. R. B., 7 Cir., 286 F.2d 442, the dissenter said: "Coercive action whether by way of fine, discharge or otherwise, which deprives a member of his right to work and his employer of the benefit of his services, cannot be said to relate only to the internal affairs of the union. * * * In my opinion, therefore, it cannot reasonably be said that the Union's conduct here related to its right 'to prescribe its own rules with respect to the acquisition or retention of membership.'" The dissenter further stated: "Employees may occupy a dual status: first, is their status as employees; second, is their status as union members. Those matters affecting employees as union members may properly be referred to as internal union affairs. Those matters which affect employees as employees are not internal union affairs. * * * Here, I am satisfied that the Union's attempt to control production and wages, which are subjects clearly related to employment, and not to membership, is not merely an internal matter."

7. On page 26 of its brief the Board cites this case and 12 others. We find the others not in point here.

the disposition which that court made of the case in remanding it to the Board, it is not clear that what was there said was other than dictum. The later decision of the same court in Allen Bradley v. N. L. R. B., supra, and the language and reasoning thereof, gives further reason to question the present authority on this particular point of the American Newspaper Pub. Association case. The rules relating to the limitation of production are plainly rules adopted for the purpose of establishing the terms and conditions of employment of union members. The rule is not directed merely to the employees; it has a direct impact upon the employer. It fixes the conditions and terms under which he may procure the services of his employees.

In Fibreboard Paper Products Corp. v. National Labor Relations Board, 379 U.S. 203, 210, 85 S.Ct. 398, 13 L.Ed.2d 233, the Supreme Court held certain action of the employer concerned "terms and conditions of employment." The Court had occasion to discuss the meaning of the quoted phrase as applied to an employer. It referred to § 8(d) of the Act requiring such collective bargaining "with respect to wages, hours, and other terms and conditions of employment."

In our view the limitation of the number of shingles which an employee might lay in an eight hour day related to the "terms and conditions of employ- · ment" of these union men even more clearly than did the attempted termination of work in the Fibreboard case. In short, we have here an attempt by unilateral action of the Unions to fix the terms and conditions of employment of union members. It follows that the rule imposed here cannot come within the proviso of § 8(b) (1) (A) for this was not a mere prescribing by the Unions of rules "with respect to acquisition or retention of membership therein." It was an attempt to prescribe the terms and conditions of employment and it was not confined to any purely internal concern of the Unions.[8] To hold otherwise would be to create a patent inconsistency in the application of the Act. Thus, § 8(d) (29 U.S.C. § 158(d)) provides that a party to a collective bargaining agreement, under a duty to bargain collectively, cannot modify the contract without serving the notice and making the offers prescribed in the proviso of that section. It would be anomalous if a union could avoid compliance with those requirements by unilaterally adopting a rule such as this one, prescribing new terms and conditions of employment.

For reasons which will presently appear we find it unnecessary to decide whether § 8(b) (1) (A), apart from the proviso, requires a finding that this labor organization's conduct operated to restrain or coerce employees in the exercise of rights guaranteed in § 7 of the Act.[9]

---

8. It is an interesting fact that the hearing examiner did not believe the rule should come within the proviso, although he assumed it did, perhaps because he considered himself bound by the board's decision in Local 283, supra. He said: "A union rule forbidding members to produce or work beyond a specified quota would not appear on its face to be a rule concerning the *acquisition* or *retention* of membership in a labor organization, this being the precise language used in the proviso to Section 8(b) (1) (A). * * * In sum, assuming that the conduct of Respondents falls within the proviso that Respondents may regulate the acquisition or retention of union membership, a result which I accept but doubt, it does not follow that Respondents, with their members bound to a union shop contract, may reallocate dues payments to the payment of other union obligations as fines and thereby imperil the employment status of these workmen."

9. Although petitioner makes this contention, the answer is by no means clear. The most authoritative exposition of what constitutes restraint or coercion within the meaning of this section is to be found in National Labor Relations Board v. Drivers Local Union, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710. The Court there found that peaceful recognitional picketing by a union which did not represent a majority of the employees was not conduct to restrain or coerce the employees in the exercise of their § 7 rights.

■ The complaint alleged that the rule was made by the Union; that it fixed certain production ceilings which should not be exceeded; and that the rule was "unilaterally established by the respondents." The words just quoted clearly allege the establishment or attempted establishment of terms and conditions of employment by the union members without collective bargaining.

The uncontradicted evidence in the case, as outlined in the Intermediate Report of the trial examiners, discloses that the rules in question were established at the June, 1961, meeting of Local 478 and approved by the District Council the same month. These rules not only were not included in the collective bargaining contract then in effect, but, as we have noted, they were precisely contrary to the provisions of that contract which fixed the wages, hours and working conditions as "the wages, hours and working conditions in the area covered by the agreement."

The undisputed evidence further shows that these production ceilings were, as alleged in the complaint, unilaterally established by the respondents. A resolution fixing production ceilings was passed by the Local at its June meeting and was approved the same month by the District Council. The employers learned of this action some time in the following August. On September 6, they made contact with the officers of the District Council and of the Local and protested the action. These facts bring this situation within the holding in the Fibreboard case.[10] Although in that case .

The Court held that § 8(b) (1) (A) was a grant of power to the Board to proceed only against union tactics involving "violence, intimidation and reprisal or threats thereof." (362 U.S. p. 290, 80 S.Ct. p. 715.) The Court did quote with approval a decision of the Board which drew the distinction between peaceable persuasion and propaganda and "physical force or threats of force, or of economic reprisal."

In the case of Roberts v. N. L. R. B., D.C. cir., 350 F.2d 427, July 21, 1965, the court treated the action of the union in fining a member for instituting proceedings before the Board against the union as constituting restraint or coercion. The Board had taken a similar position in Local 138 International Union of Operating Engineers (Chas. S. Skura) 148 NLRB No. 74, reported in 1964 CCH NLRB Dec. #13,369.

Generally speaking § 7 of the Act guarantees to the employee the right to refrain from engaging in union or concerted activities. Petitioner contends that these employees who were fined by the Union had the right under § 7 to refrain from participating in the concerted effort to limit production and that the Union action here in question restrained or coerced them from exercising that right. (The dissenting opinion of Board member Leedom in Local 283, U.S.W., footnote 6, supra) read in connection with the remarks of Senator Taft at the time this section was adopted on the floor of the Senate, (see footnote 5, supra), are persuasive in support of petitioner's position.) It might be argued, however, that when an employee joins a union, he gives up some portion of his right thus to refrain from such participation in the concerted effort to limit production. Allis-Chalmers Mfg. Co. v. N. L. R. B., 7 Cir. (Set. 13, 1965), so holds. (Rehearing granted October 14, 1965.)

These are matters which are not spelled out in the Act, and we have been unable to find any authoritative decisions which will furnish us answers. The confusion about the meaning of § 8(b) (1) (A) was pointed out in an article by Prof. Archibald Cox "Some Aspects of the Labor Management Relations Act 1947," 61 Harv.L.Rev. 1, 33 (1947). He there remarked: "The scope and variety of the foregoing problems suggest that Section 8(b) (1) may plunge the Board into a dismal swamp of uncertainty. Its vagueness alone, not to mention the broad interpretations put upon it during the debates in Congress, encourages the filing of great numbers of charges as weapons in fighting the unionization of a plant. A long period of uncertainty and heavy volume of litigation will be necessary before the questions of interpretation can be resolved." Fortunately we find it unnecessary to solve these problems.

10. In Fibreboard, the company informed the union at a July 27 meeting that it had determined to contract out the work effective August 1. There was then discussion of the company's right to make such a contract and it was agreed that the parties would meet again on July 30. By

the refusal to bargain collectively was on the part of the employer, we think the holding applies as well to the situation before us, where the actions of the union are at issue.

We think, after studying the record, that it would have been apparent to any person who observed the hearings in this case that a key issue presented by the evidence was the failure of the union to bargain collectively. This conclusion is based on the extended discussion at the hearings of the unilateral nature of the Unions' action, action which obviously affects the terms and conditions of employment.

It is true that the complaint by way of conclusion alleged that the acts described violated § 8(b) (1) (A) and neglected to name what are in our view the most significant sections, namely, §§ 8(b) (3) and 8(d). Section 8(b) (3) makes it an unfair labor practice for a labor organization "to refuse to bargain collectively with an employer" when the union is representative of the employees.[11] Section 8(d) defines collective bargaining, provides that it is the obligation of the parties to confer with respect to "terms and conditions of employment", and contains a proviso which is precisely applicable to the situation presented by the facts in this case where there was in effect a collective bargaining contract which would have to be modified before the new production limitations would be binding upon the employer. That proviso is set forth at length in the margin.[12]

The failure to mention §§ 8(b) (3) and 8(d) in the complaint should not have prevented the Board from considering their applicability. We agree with the position taken on this question in American Newspaper Pub. Association v. N. L. R. B., supra, and in Frito Company, Western Division v. N. L.

---

July 30 the company had selected the new contractor. At the July 30 meeting the company's representative explained the reason for its decision. The union then filed unfair labor practice charges against the company.

11. Collective bargaining was of particular importance in the circumstances of this case. The Executive Secretary-Treasurer of the District Council testified that when the production limitation rule was adopted he said he "didn't think it was proper." If a shingler is operating on a roof full of hips and valleys or otherwise cut up, an appropriate number of squares would obviously be far different than if the roof is a "tract job" with flat or straight roof. An appropriate quantity in a calm day would vary from that in a high wind. Collective bargaining might well produce a more refined system of production limitations.

Furthermore, the good sense of the prohibition against unilateral action on issues involving terms and conditions of employment is graphically illustrated in the instant case. Here the production limitation places the union employees in a precarious position; for if they violate the union rule, they will be subjected to union discipline, but if they restrict their output, the employer may exercise his discretion to fire them.

12. "*Provided*, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification; (2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications; (3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and (4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later; * * *."

R. B., 9 Cir., 330 F.2d 458. In American Newspaper the Board held that the acts alleged in the complaint as constituting violations of § 8(b) (1) (A) did not come within the prohibition of that subsection of the Act. The court noted that the Board "apparently was under the impression that, since the particular action alleged, was not alleged to be a violation of § 8(b) (3), it was required to dismiss this charge without passing upon the sufficiency of the proof. We think this action of the Board, in so dismissing the charge of failure to bargain in good faith, constituted error." [13]

This holding finds support in other cases involving Labor Board proceedings, other administrative proceedings, and in the application of the Federal Rules of Procedure in the courts. Thus in National Labor Relations Bd. v. Pecheur Lozenge Co., 2 Cir., 209 F.2d 393, 402, the court said: "Moreover, the Board would not be precluded from finding that the Company's conduct in December 1949 also violated Section 8(a) (5), even though the complaint had only alleged that such conduct violated Section 8(a)

(1). We think it would not matter that the complaint failed to mention a specific section of the Act, if the alleged conduct was in fact violative of that section." The court then quoted with approval certain of the language of the American Newspaper case which we have quoted in' footnote 14, above. To the same effect is Garber v. C. A. B., 2 Cir., 276 F.2d 321, 323.

And since, as noted in the Frito case, supra, the Board's Regulations contemplate that its hearings shall be controlled "as far as practicable" by the Federal Rules of Civil Procedure, it is of interest to note what was said in Dotschay for Use and Benefit of Alfonso v. National Mutual Insurance Company, 5 Cir., 246 F.2d 221, 223, which considers the analogous situation in the district court. The court said: "It seems to us that the district court overlooked our liberal rule of federal practice under which the complaint is not to be dismissed because the plaintiff's lawyer has misconceived the proper legal theory of the claim, but is sufficient if it shows that the plaintiff is entitled to *any* relief which the court

---

13. The court said (193 F.2d p. 799): "The failure to specify in the complaint the correct subsection of the Act did not require the Board to dismiss this charge without a consideration as to the sufficiency of the proof. Where, as here, the complaint clearly describes an action which is alleged to constitute an unfair labor practice but fails to allege which subsection of the Act has been violated or alleges the wrong subsection, such failure or mistake, if it does not mislead the parties charged, does not prevent the Board from considering and deciding the charge so presented.

In the rules and regulations promulgated by the Board to cover procedure before it, the Board recognized that the accomplishment of the broad purposes of the Act should not be hindered nor prevented by technicalities in procedure. This is shown by the fact that in these rules and regulations the Board provided that: 'These Rules and Regulations shall be liberally construed to effectuate the purposes and

provisions of the Act.' 29 U.S.C.A. § 102.93.

The function of the complaint in such an unfair labor practice was well stated in National Labor Relations Board v. Piqua Munising Wood Products Co., 6 Cir., 109 F.2d 552, 557, where the Court stated: 'The sole function of the complaint is to advise the respondent of the charges constituting unfair labor practices as defined in the Act, that he may have due notice and a full opportunity for hearing thereon. The Act does not require the particularity of pleading of an indictment or information, nor the elements of a cause like a declaration at law or a bill in equity. All that is requisite in a valid complaint before the Board is that there be a plain statement of the things claimed to constitute an unfair labor practice that respondent may be put upon his defense. (Citing cases.)' The complaint in the instant case was adequate to meet these requirements."

can grant, regardless of whether it asks for the proper relief." [14]

In the Frito case, supra, the employer and the union were charged with the violation of § 8(e) of the Act. The violations that were charged related to certain provisions in their collective bargaining contract. The complaint filed by the General Counsel asserted the invalidity of §§ C(1) and (3). It said nothing about the validity of § B and § C(2). The Board directed the respondents to cease and desist from giving effect to §§ C(1) and (3) of the collective bargaining contract. It held that since the complaint had not placed in issue the validity of §§ B and C(2) the Board was precluded from considering that issue.

Upon petition for review and modification of the Board's order, the employer contended that the Board should have found invalid the sections of the contract which were not listed in the complaint by the General Counsel. The court noted that the proof in the case had been admitted without objection. It found that the Board under these circumstances "could render a decision based upon the issues actually tried without ordering amendment, or it could order amendment to conform to proof or conduct further hearings in the premises." [15] The court took note of § 101.10 of the Code of Federal Regulations which provides: "The rules of evidence applicable in the district courts of the United States under the Rules of Civil Procedure adopted by the Supreme Court are, so far as practicable, controlling." The court said of this (330 F.2d p. 465): "The provision noted must be taken to mean that the procedure to be followed in hearings before the Board shall be controlled as far as practicable by the Federal Rules of Civil Procedure." The court then quoted Rule 15, Federal Rules of Civil Procedure. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In other words, where evidence is received without objection the pleadings are to be deemed amended. Such was the view the court took of the situation before it and accordingly it remanded the case to the Board for further proceedings dealing with those matters disclosed by the proof admitted without objection.[16] We feel the facts of this case warrant similar treatment.

Thus we remand the cause to the Board for the purpose of making findings with respect to the apparent failure of the Unions to bargain collectively with the employers before initiating their production limitations. If the Union's claim

---

14. This case is cited with approval in Moore's Federal Practice, 2nd Ed., vol. 2, § 8.14, p. 1715. And compare F.R.Civ. P. Rule 54(c):

"Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

15. In the case before us the General Counsel asked, and was granted leave to "conform the pleadings to the proof." The concluding portion of the trial record reads as follows: "Do the parties have anything further? Mr. Kintz: The General Counsel wishes to move to conform the pleadings to the proof. Trial Examiner: With respect to the formal papers? Mr. Kintz: Yes. Trial Examiner: Is there any objection? Mr. Van Bourg: Just one second, Mr. Hearing Examiner, I would just like to take a look at the complaint. We have no objection. Trial Examiner: All right, the motion is granted." No doubt this was General Counsel's means for seeing to it that any relief warranted by the proof should not be rejected because of a defect in the complaint. No objection could be made in the allowance of the requested amendment because of the six month limitation of § 10(b) (29 U.S.C. § 160(b)). Here there has been continuous enforcement of the production limitation rules. See Katz v. N. L. R. B., 9 Cir., 196 F. 2d 411, 415.

16. The Board itself approved and followed Frito in Independent Metal Workers Union, Locals 1 and 2, Hughes Tool Co. and United Steelworkers of America, AFL-CIO, reported in 1964 C.C.H. NLRB Decisions, Paragraph 13,250.

that due to the omission of an appropriate reference to §§ 8(b) (3) or 8(d) in the complaint [17] and the failure of the trial examiner and the Board to make findings in respect to the failure to bargain collectively the Unions were unable to properly defend against that charge, the Board shall permit the Unions to make proof accordingly.

If the Board finds that the Unions were here guilty of an unfair labor practice in failing to bargain collectively, then the Board shall order whatever relief it deems appropriate.[18]

It is so ordered.

17. But see footnote 15, supra.

18. The question of relief in such cases is discussed in Fibreboard Paper Products Corp. v. National Labor Relations Board, supra.